**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Dennis WELLIVER, Defendant–
Appellant.**

**No. 91–3794.**

United States Court of Appeals,
Eighth Circuit.

Submitted May 15, 1992.

Decided Oct. 1, 1992.

---

Sandra L. Dougherty, Omaha, Neb., argued, for defendant-appellant.

Alan L. Everett, Asst. U.S. Atty., Lincoln, Neb., argued, for plaintiff-appellee.

Before McMILLIAN, JOHN R. GIBSON, and BEAM, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Dennis Welliver was charged with a multi-count indictment in connection with the filing of certain accounting reports with the Federal Crop Insurance Corporation (FCIC). A jury convicted him of two counts of mail fraud, in violation of 18 U.S.C.A. § 1341 (West Supp.1992), two counts of making false statements to the FCIC, in violation of 18 U.S.C.A. § 1014 (West Supp.1992), two counts of theft, in violation of 18 U.S.C. § 641 (1988), and three counts of wire fraud, in violation of 18 U.S.C.A. § 1343 (West Supp.1992). Welliver appeals, claiming that: (1) the district court erroneously allowed illegally obtained evidence; (2) the evidence was insufficient to support his conviction; (3) the district court should not have allowed the jurors to question witnesses; and (4) he was the victim of selective prosecution. We affirm the judgment of the district court.[1]

The FCIC, an agency of the United States Department of Agriculture, provides

---

1. The Honorable Warren K. Urbom, Senior United States District Judge for the District of Nebraska.

farmers with multiple peril crop insurance through reinsurance agreements with private insurance companies. The private companies sell and service the crop insurance policies, collect premiums, and settle claims. The FCIC reimburses the companies for their administrative expenses and for losses paid out to farmers. Reimbursements are based on monthly reports the private insurance companies are required to compile, certify as "complete and correct," and send to Crop Hail Insurance Actuarial Association. Crop Hail processes the reports for the FCIC, edits them for accuracy, and notifies the company of any errors. Crop Hail creates a monthly accounting report, and sends it to the company, which in turn sends it to the FCIC to receive payment.

Omaha Indemnity Company and Omaha Property and Casualty Company entered into standard reinsurance agreements with the FCIC. Welliver, the sole proprietor of Omaha All Risk Insurance Services in Lexington, Nebraska, was the managing general agent for these companies, and was responsible for conducting all daily transactions with the insureds and the FCIC. Managing general agents are bound by all the FCIC rules and regulations applicable to the reinsured companies themselves.

Welliver was also the sole proprietor of Nebraska Computer and Financial Services, a company that did the accounting and computer work for Omaha All Risk. Terry Anderson was Welliver's director of computer operations. Evelyn Tuma, a computer programmer for Nebraska Computer and Financial Services, created, maintained, and tested computer programs and assisted with various computer operations and Crop Hail transmissions.

In May 1987, Welliver met with Tuma and Anderson to discuss the delayed entry of Omaha All Risk's 1987 premium information into their computer system, which delayed reporting to the FCIC and held up reimbursement. Welliver asked them to "roll over" 1986 premium information and submit it to Crop Hail as current 1987 information. Welliver asked Anderson to maintain a listing of the rolled over poli-

cies. Tuma wrote a program and rolled over the policies as Welliver had instructed.

In March 1988, Welliver again met with Tuma and Anderson and discussed "doubling" approximately $80,000 of losses on Crop Hail reports by changing the "seed code." This could be done by running an existing reported loss that had cleared the Crop Hail edits through the system a second time under a different code to report it as a separate, additional loss. Anderson doubled a loss from a California insurance policy, and Tuma also doubled losses at Welliver's direction, including two from Colorado and California policies in April 1988.

In 1988, Gary Diers, a special agent for the Office of the Inspector General of the United States Department of Agriculture, began investigating Omaha All Risk regarding a matter unrelated to this case. He contacted Evelyn Tuma and met with her on May 26, 1988. Diers showed Tuma his badge and a piece of paper listing the penalties for aiding and abetting. He told her she was not in any trouble, she did not need a lawyer, and he simply wanted to ask her some questions about Omaha All Risk. Tuma eventually told Diers about the rollovers and described certain documents at Omaha All Risk that would constitute evidence of the practice. Diers asked Tuma to retrieve these documents for him, but Tuma had reservations. Diers assured her that as long as the documents were not under "lock and key" and were not "something [she] shouldn't be looking at any way," she had a right to obtain them.

Tuma, still unsure about the propriety of taking the documents out of the office, contacted the local county sheriff, who told her that he thought it was within her rights to take the documents. Tuma went to Omaha All Risk and retrieved a number of documents from Terry Anderson's desk drawer, which both she and Anderson used. Tuma also later gave additional documents to Diers. These documents were used to prepare search warrants for Omaha All Risk's Nebraska and Texas offices, which were executed October 25, 1988.

A grand jury charged Welliver and Paul Buchanan Jr., Omaha All Risk's Texas branch manager, with various counts of mail fraud, wire fraud, false statements, theft, and conspiracy in connection with their dealings with the FCIC. At trial, Welliver moved to suppress the records Tuma turned over to Agent Diers. The district court denied the motion, concluding that Tuma was not an agent of the government and Welliver had no expectation of privacy in the documents. The jury acquitted Buchanan, but could not reach a unanimous verdict against Welliver. The district court dismissed the conspiracy count against Welliver and declared a mistrial on the remaining counts.

At his second trial, Welliver again moved to suppress the documents Tuma had taken, and the district court denied the motion. The jury convicted Welliver on all counts. The district judge sentenced Welliver to three years probation and six months of home confinement. He ordered Welliver to perform 600 hours of community service, pay a fine of $23,174.61, and make restitution in the amount of $7,724.87. Welliver filed this appeal.

## I.

■ Welliver argues that the district court erred in denying his motion to suppress the business records [2] Tuma seized and all the testimony concerning the records because the seizures violated his Fourth Amendment rights. One claiming a Fourth Amendment violation must show that: (1) he had a legitimate expectation of privacy, and (2) that expectation was invaded by government action. *Smith v. Maryland*, 442 U.S. 735, 740, 99 S.Ct. 2577, 61 L.Ed.2d 220 (1979).

■ We first consider whether Welliver had a legitimate expectation of privacy in the records Tuma seized. This is a two-part inquiry: (1) whether Welliver asserted a subjective expectation of privacy, a question of fact; and (2) whether Welliver's subjective expectation is objectively reasonable, a question of law. *United States v. Kiser*, 948 F.2d 418, 423 (8th Cir.1991), *cert. denied,* — U.S. —, 112 S.Ct. 1666, 118 L.Ed.2d 387 (1992) (relying on *Smith,* 442 U.S. at 740, 99 S.Ct. at 2580, and *California v. Ciraolo*, 476 U.S. 207, 211, 106 S.Ct. 1809, 1811, 90 L.Ed.2d 210 (1986)). The Supreme Court first enunciated this test in *Katz v. United States*, 389 U.S. 347, 351, 353, 88 S.Ct. 507, 511, 512, 19 L.Ed.2d 576 (1967).

Under *Katz,* the first question involves determining whether the person, by her conduct, has demonstrated an actual expectation of privacy, *id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring), or sought to preserve something as private. *Id.* at 351–52, 88 S.Ct. at 511–12. The second question involves deciding whether the individual's asserted privacy interest is legitimate, i.e., "one that society is willing to recognize as 'reasonable.'" *Id.* at 361, 88 S.Ct. at 516 (Harlan, J., concurring). In *United States v. Hendrickson,* 940 F.2d 320 (8th Cir.), *cert. denied,* — U.S. —, 112 S.Ct. 610, 116 L.Ed.2d 633 (1991), we stated that "[t]he test for legitimacy is not whether an individual chooses to conceal his or her activity, but instead 'whether the government's intrusion infringes upon the personal and societal values protected by the Fourth Amendment.'" *Id.* at 322 (quoting *Ciraolo,* 476 U.S. at 212, 106 S.Ct. at 1812). We concluded that this "ultimate question under *Katz* 'is a value judgment.'" *Id.* (citations omitted).

The district court relied on two cases involving employees who have turned their immediate employer's business records over to the government: *United States v. Ziperstein,* 601 F.2d 281 (7th Cir.1979), *cert. denied,* 444 U.S. 1031, 100 S.Ct. 701,

---

**2.** The records at issue are as follows: An internal Omaha All Risk computer print-out which Anderson created and used to change the seed code for doubling losses; Tuma's handwritten notes on the policies she used to double losses; a computer print-out Tuma created of the raw data pertaining to doubling; a print-out of the program Tuma created to roll over 1986 policies into the 1987 year; computer print-outs of policies that Tuma rolled over and sent to Crop Hail Insurance; and a computer print-out containing a comprehensive listing of the policies Omaha All Risk rolled over.

62 L.Ed.2d 667 (1980), and *United States v. Miller,* 800 F.2d 129 (7th Cir.1986). In *Ziperstein,* the defendant owned medical clinics that received Medicare and Medicaid funding and two companies that handled the Medicare and Medicaid billing. 601 F.2d at 284. He argued that the district court erred in failing to suppress certain records he claimed one of his employees, a pharmacist, had "stolen" and turned over to the government.[3] *Id.* at 288. The Seventh Circuit held that the defendant had no legitimate expectation of privacy in the documents. *Id.* at 289. The court relied on *Marshall v. Barlow's, Inc.,* 436 U.S. 307, 98 S.Ct. 1816, 56 L.Ed.2d 305 (1978), which states that "[w]hat [employees] observe in their daily functions is undoubtedly beyond the employer's reasonable expectation of privacy." *Ziperstein,* 601 F.2d at 315. The court in *Ziperstein* reasoned that pharmaceutical prescriptions came within the pharmacist's daily observations, and accordingly, there was no impropriety in his "obtaining control over the records which serve[d] as the basis of his daily activities." *Id.* at 289.

Seven years later, the Seventh Circuit faced a similar issue in *Miller.* An employee, refusing his employer's request that he hide business records at his home, contacted the authorities and suggested that they immediately come to the clinic, ask for the records, and have a subpoena. *Miller,* 800 F.2d at 131–32. The authorities did so. *Id.* at 132–33. The district court in *Miller* found that all the clinic employees had access to the records and none of the records were kept in restricted or private areas. *Id.* at 131. Further, the employee had access to the employer's premises, permission to use all the records there, and did, in fact, use many of them on a regular basis. *Id.* at 131–32. The district court denied the defendant's motion to suppress. *Id.* at 133.

In its Fourth Amendment inquiry, the Seventh Circuit focused on whether the employee was the custodian of the records. *Id.* Discussing agency principles of actual and apparent authority, the court cited *Marshall* regarding "what 'employees observe in their daily functions.' " *Id.* at 134 (quoting *Marshall,* 436 U.S. at 315, 98 S.Ct. at 1821). The court held that the district court's findings of fact indicated that the employee had actual authority to turn over the records. *Id.* The court pointed out, however, that the employer's order to hide the records expressly limited the employee's authority. *Id.* at 134–35. It acknowledged that the employer asserted a subjective expectation of privacy in the documents, but held that his order to the employee constituted an unacceptable request to obstruct justice. *Id.* at 135. The court upheld the district court's denial of the motion to suppress, concluding that the employee's authority to dispose of the records defeated the employer's Fourth Amendment claim. *Id.*

Although both *Ziperstein* and *Miller* relied on *Marshall,* we are not convinced it is dispositive of the issue before us. Certainly, *Marshall* mentions that the observations of employees in their daily functions are beyond an employer's reasonable expectation of privacy, 436 U.S. at 315, 98 S.Ct. at 1821, but it does not treat this issue in detail. It is also true that neither *Ziperstein* nor *Miller* analyzed the facts under the two part subjective and objective expectation of privacy *Katz* test.

The district court in this case did not specifically discuss Welliver's subjective expectation of privacy. This, however, is similar to *California v. Ciraolo,* 476 U.S. at 211, 106 S.Ct. at 1811, in which the Supreme Court found it unnecessary to address the subjective expectation of privacy question because the finding on that issue had not been challenged. Likewise, al-

---

**3.** The defendant also claimed that the pharmacist was acting as an agent of the government in obtaining these records. 601 F.2d at 288. The Seventh Circuit rejected this theory because the employee initiated contact with the government to report evidence of wrongdoing in one of defendant's clinics, obtained the documents le-

gitimately, and gave the documents to the FBI on his own volition. *Id.* at 289. Our disposition of Welliver's case on the grounds of legitimate expectation of privacy, *see infra* at 1153–54, makes it unnecessary to discuss the government agent issue.

though the district court made no finding on this issue and seems to have assumed it, the government has not challenged Welliver's subjective expectation, and there is evidence in the record to support a subjective expectation of privacy finding.

■ The determinative issue, however, is whether the subjective expectation of privacy was reasonable, and in this respect, the district court concluded:

> I think it's true that there was no reasonable expectation of privacy in the information contained in these documents. It was expected that the information contained in these documents, or much of it, would be sent to [Crop Hail]. . . .
>
> The fact that not all of the information would likely go any place doesn't retain for the whole the expectation of privacy. As far as I can tell it's probably true that the only information on the documents that would not be revealed to some outside person or company or agency was the fact that this really was 1986 information rather than 1987. . . . But the rest of it was expected to go some place, whether in detailed form or in summary form. I think that ruins the claim of a reasonable expectation of privacy.
>
> The presence of the reinsurance agreement is not irrelevant. . . . [I]t has to do with whether there was a reasonable expectation that these documents, information in the documents would be kept private. And it militates in the direction of nonprivacy.

Suppression Hearing Transcript at 123–24. We are convinced that the district court did not err in ruling that Welliver had no objectively reasonable expectation of privacy in the documents. Therefore, under *Ciraolo*, which accepted and assumed a subjective expectation of privacy but found that it was not objectively reasonable, 476 U.S. at 212–15, 106 S.Ct. at 1812–14, we must reject Welliver's argument that the evidence should have been suppressed.

Much testimony at the suppression hearing focused on whether the documents were for internal purposes only or whether they would be sent to Crop Hail and the FCIC. The reinsurance agreement re-

solves the issue. A provision of the agreement states:

> Access to Records and Operations
>
> The Company must provide FCIC, USDA, and the Comptroller General of the United States and their authorized representatives, for the purpose of investigation, audit, or examination, access to any record or operation of the Company. The Company must keep records that fully disclose all matters pertaining to this Agreement, including premiums and claims paid or payable under this Agreement. Records relating to premiums must be retained and available for three (3) years after final adjustment of such premiums, and records relating to reinsurance claims shall be retained and available for three (3) years after final adjustment of such claims.

Under this provision, the FCIC and other federal government entities had the right to inspect *any* company records. Although Welliver argues that his company, as merely a managing general agent, was not a party to the reinsurance agreement with the FCIC, Timothy Hoffman, the FCIC's director of the Kansas City, Missouri compliance office, testified that managing general agencies are bound by the same rules and regulations as the reinsured companies. Even if Welliver subjectively asserted his expectation of privacy in the documents at issue, that expectation was clearly unreasonable, as he was obligated to give the FCIC "access to any record or operation of the Company" "for the purpose of investigation, audit, or examination." Because of this holding, we need not determine whether Tuma was an agent of the government when she procured the records for Agent Diers. We conclude that the district court did not err in denying Welliver's motion to suppress.

## II.

■ Welliver argues that the evidence was insufficient to support his conviction. Although he admits that he "does not challenge the fact that the government evidence established that the 'doubling' and 'rollover' did occur," he contends that there

was insufficient evidence of his criminal intent.

In reviewing the denial of a motion for acquittal, we view the evidence in the light most favorable to the government, giving it the benefit of all reasonable inferences from that evidence. *Glasser v. United States,* 315 U.S. 60, 80, 62 S.Ct. 457, 469, 86 L.Ed. 680 (1942); *United States v. Long,* 952 F.2d 1520, 1524–25 (8th Cir.1991). We will reverse only if the jury must have entertained reasonable doubt as to the defendant's guilt. *United States v. Jones,* 880 F.2d 55, 64 (8th Cir.1989).

Welliver's argument hinges on witness credibility and slight inconsistencies in the testimony of Evelyn Tuma and Terry Anderson. Our review of the record shows that there was sufficient evidence to demonstrate Welliver's intent to commit the rollovers and doubling. Both Tuma and Anderson testified that in May 1987 they met behind closed doors with Welliver, who asked them to roll over the 1986 premium information and submit it to Crop Hail as current 1987 information. Both of them recalled that Welliver had gotten the idea from other companies that were employing the process. They said that Welliver wanted to get premium information reported sooner so "we could get our commission, our money back sooner." Tuma wrote the program and used it to roll over policies at "Dennis's instructions."

Although Welliver argues that problems getting information to pass through Crop Hail's edits motivated the rollovers, both Tuma and Anderson testified that the situation was created by Omaha All Risk's own inability to process information so it could be reported to Crop Hail. Tuma testified that Welliver had stated that he did not believe the rollover process was "quite Kosher." When the rollover process created a large error list, Welliver commented to Anderson and Tuma that they "couldn't even cheat right."

Anderson testified that in March 1988 Welliver met with him and Tuma and discussed how to double certain losses on Crop Hail reports by changing the seed code. Welliver specifically told them that

he wanted to double approximately $80,000 of losses. Although Tuma could not specifically recall a meeting taking place in March 1988, she remembered a number of meetings regarding doubling. She doubled losses several times after discussions with Welliver and specifically recalled doubling certain Colorado and California losses in April 1988 at his direction.

■ Even if Welliver properly blames the Crop Hail edit system for his resort to doubling losses, his argument is premised on the assumption that he was entitled to submit false information to FCIC through Crop Hail to compensate for processing problems. The reinsurance agreement, which Welliver was bound by, clearly forbade such a practice, as it required that all reports submitted to the FCIC be "complete and correct."

Regardless of Welliver's stated motivations, there was sufficient evidence for the jury to conclude that he intentionally directed his employees to submit false information to Crop Hail and the FCIC and, therefore, sufficient evidence to support his conviction.

## III.

Welliver also argues that the district court erred in allowing the jurors to question the witnesses at trial. Welliver, however, failed to make a single objection during the jury questioning. Accordingly, we review only for plain error. *United States v. Land,* 877 F.2d 17, 19 (8th Cir.), *cert. denied,* 493 U.S. 894, 110 S.Ct. 243, 107 L.Ed.2d 194 (1989).

■ Welliver makes lengthy policy arguments against allowing the practice of jury questioning. His specific complaints, however, involve the court's refusal to allow witnesses to answer two questions that Welliver claims were favorable to his defense. The district court rejected both of these questions on relevancy grounds. We must therefore conclude that the district court did not plainly err in allowing juror interrogation of witnesses.

Nevertheless, we state once again that we have strong concerns about juror ques-

tioning of witnesses. In this case, the potential for error was magnified as the questions were propounded before the other jury members. In at least three cases, members of this court have voiced strong objections to this practice. *United States v. Gray*, 897 F.2d 1428, 1429–30 n. 1 (8th Cir.1990) (Judges Bowman, Beam, and Henley); *United States v. Johnson*, 892 F.2d 707, 711–15 (8th Cir.1989) (Judges Lay and McMillian concurring and stating that juror questioning is "inherently prejudicial and should not be condoned"); *United States v. Land*, 877 F.2d at 19 (Judges Arnold, Bowman, and Magill). These decisions in which seven, now eight, of the judges of this court have joined make evident that juror interrogation of witnesses presents substantial risk of reversal and retrial. Where a record is properly made and the record permits a conclusion that prejudice occurred, this will be the inevitable result.

### IV.

Finally, Welliver claims the district court erred in failing to grant him a hearing on his motion to dismiss on the ground of selective prosecution. A defendant has a heavy burden in proving a selective prosecution claim, *United States v. Eklund*, 733 F.2d 1287, 1290 (8th Cir.1984), *cert. denied*, 471 U.S. 1003, 105 S.Ct. 1864, 85 L.Ed.2d 158 (1985), and must meet a two-part test for a prima facie claim. *Id.* The defendant must first show that the government has singled him out for prosecution, while failing to prosecute others similarly situated who engaged in similar conduct. *Id.* Second, he must show that the government based its discriminatory selection on an impermissible ground such as religion, race, or exercising the right of free speech. *Id.*

A district court should grant a hearing on a defendant's selective prosecution claim if the defendant alleges "sufficient facts to take the question past the frivolous state," *United States v. Catlett*, 584 F.2d 864, 866 (8th Cir.1978), and raises a reasonable doubt about the prosecutor's purpose. *Id.* Without these showings, it is presumed that the government prosecuted the case in good faith and in a nondiscriminatory way pursuant to its duty to bring offenders to justice. *Eklund*, 733 F.2d at 1291.

The district court determined that Welliver met the first part of the prima facie test, but failed the second. Specifically, Welliver's claims that the government prosecuted him because he criticized the FCIC were unsupported by factual allegations sufficient to raise a reasonable doubt as to the government's motives. The record demonstrates that the district court did not err in so holding, and we affirm its denial of Welliver's motion to hold a hearing on this matter.

We affirm the district court's judgment.