## State of Vermont v. John Doleszny

[844 A.2d 773]

No. 01-310

Present: Amestoy, C.J., Dooley, Johnson, Skoglund and Reiber, JJ.

Opinion Filed January 30, 2004

*William H. Sorrell*, Attorney General, and *John Treadwell*, Assistant Attorney General, Montpelier, for Plaintiff-Appellee.

*Matthew F. Valerio*, Defender General, and *Anna Saxman*, Deputy Defender General, Montpelier, for Defendant-Appellant.

¶ 1. **Dooley, J.** The question presented is whether the district court's decision permitting jurors to submit questions for the witnesses in this criminal trial deprived defendant of an impartial jury and a fair trial. For the reasons set forth below, we conclude that the practice of jurors questioning witnesses in the trial court's discretion is permissible. In reaching this conclusion, we join the vast majority of states, federal courts, and commentators that have considered this issue. Accordingly, we affirm the judgment.

¶ 2. The pertinent procedural and factual background may be summarized as follows. In July 2000, defendant was charged with bribing an executive officer in violation of 13 V.S.A. § 1101(a)(1). In a pretrial order, the district court invited the parties to comment on a set of proposed preliminary jury instructions, including an instruction that informed the jurors they could submit questions of their own to the witnesses after the attorneys had completed their examinations. Defendant filed a written motion, objecting to the proposed instruction on the ground that allowing juror questions risked compromising the jury's neutrality and reducing the State's constitutional burden of proving defendant's guilt. The State filed no response.[1]

¶ 3. The court denied defendant's motion in a ten page written decision, concluding that juror questions would "enhance the search for truth without violating Defendant's right to due process," and that defendant's concerns could be adequately addressed through a series of procedural

---

[1] The proposed instruction was derived from guidelines promulgated by the Jury Communications Committee, which had been appointed by this Court to examine the current operation of the jury system in Vermont and to study policies and procedures in other states. The committee invited trial courts to experiment with juror questions, and provided questionnaires for the participants to evaluate their experience.

protections. In its decision, the court noted that although defendant had failed to adequately support his claims that there were "compelling circumstances not to allow juror questioning in this case" and that allowing juror questions "will greatly reduce the State's burden to prove its case" both defendant and the State were permitted to "make specific objections to any question." The court then proceeded to deliver the charge as proposed. The instruction informed the jurors that they could seek to have questions of their own submitted to the witnesses after the attorneys had finished asking questions, but cautioned the jurors to exercise the opportunity "sparingly," to limit their questions to "facts," and to "remain neutral and impartial and not assume the role of investigator or advocate." The court explained that it would solicit juror questions after the lawyers had finished with each witness, that the jurors were to write their questions on a piece of paper without identifying themselves, and then give the paper to the court officer. The court warned that it may decide not to ask a question or may ask the question in a modified form because of the rules of evidence or for other reasons, and asked the jurors not to speculate about why a question was not asked, or to hold it against the State or defendant, or to give any more or less weight to a question solely because it was asked by a juror.[2] Defend-

---

[2] The court's instruction, in its entirety, was as follows:

During this trial you may also seek to have questions of your own asked of any witness after the attorneys have finished asking questions of that witness. Please keep in mind however that the prime responsibility for presenting evidence rests with the attorneys; therefore, please exercise this opportunity sparingly and only if you believe that your question will not or cannot be answered by some other witness likely to be called.

Your questions should only be about the facts, such as if you are confused or did not understand something a witness said and would like the matter clarified. Please do not state an opinion in your question or even write down the reason you are asking the question.

It is important to keep in mind that you not let yourselves become aligned with either side in the case. Your questions should not be directed at helping or responding to either side. Rather, you must remain neutral and impartial and not assume the role of investigator or advocate.

The process by which you may present questions for a witness will be as follows: Once the attorneys have completed their questioning of each witness, I will ask whether any juror has a question that you would like to ask that witness. If so, you will be asked to write that question down on a piece of paper and your pad, not to sign or identify yourself on the paper, then fold the paper and pass it to the court officer who will give it to me. I may decide that some of the questions you submit should not be asked or should only be asked in some modified form. Please do not be offended if this happens.

ant did not place any objection on the record after the instructions were given. The case proceeded to trial. Each side presented one witness. The State called the arresting officer, who testified that he was on patrol on the morning of May 26, 2000, when he observed a tow-truck towing a vehicle without flashing its emergency lights. The officer followed the tow-truck for several blocks in his cruiser, clocked its speed at forty-five miles per hour in a twenty-five mile per hour zone, and signaled the driver to pull over. The officer approached the tow-truck, asked the driver — later identified as defendant — for his license and registration, and informed him that he had been towing a vehicle without emergency lights and speeding. When defendant learned that the officer was preparing a speeding ticket, he pleaded with the officer to cite him for the emergency-lights violation instead in order to avoid the penalty points that accompany a speeding violation. According to the officer, defendant then asked him if there was "any way we can work this out" and the officer asked defendant what he meant. Defendant responded that "he could tow my car for free" and explained that he had towed the police department's cars for free in the past. The officer declined the offer, completed the ticket, and followed defendant to the service station.

¶ 4. After the attorneys completed their examinations, the court inquired whether "[a]ny jurors have a question they'd like to put to this witness?" Two questions were submitted. The court convened a bench conference, and defense counsel indicated that she did not object to either question. The State objected on relevance grounds to the second question, which the court overruled. The court then addressed the two questions to the officer, inquiring first whether defendant had specifically "used words about towing a police car or towing your personal car or neither?" The officer responded that defendant had "told me that he

Although I will not have a chance to explain to you, at the time, why I have not asked or have modified one of your questions, my decision not to ask a question will have nothing to do with the quality of the question. There are written rules of evidence which must be followed and employed to all questions, whether from the attorneys or from you, and no one expects you to know those rules when proposing a question.

I may decline to ask a question if it appears another witness will be testifying later and will deal with the matter raised by your question. There may be other reasons that questions are not asked. Although I will review each question proposed with both attorneys, the decision on whether to ask the question will be mine; therefore, please do not speculate on why a question was not asked or what the answer might have been. Do not count my decision to ask or not ask your question for or against the State or the defendant. And lastly, please do not give any more or less weight to a question as to the witness solely because it was asked by a juror.

could tow my car for me." The second question was "how accurate" the officer considered his assessment of the tow-truck's speed. The officer stated that it was "very accurate." Defense counsel then engaged in a brief recross examination, inquiring into the distance required for an accurate determination of a vehicle's speed. The State had no follow-up questions.

¶ 5. Defendant was the only witness for the defense. He acknowledged that he had asked the police officer for a "break" based on the services that he had provided the police department in the past. Defendant claimed, however, that he was only attempting to persuade the officer to cite him for failing to illuminate the vehicle's emergency lights rather than speeding. He denied offering the officer anything in return for his dispensing with the speeding ticket.

¶ 6. When the attorneys had completed their examination of defendant, the court once again inquired whether any of the jurors had questions for the witness. Five questions were submitted. At a bench conference to review the questions, neither counsel objected to the first question, which inquired about the make and model of defendant's tow-truck and the vehicle being towed. Defense counsel objected on relevance grounds to the second question, which was whether the speeding ticket had been paid. The court overruled the objection, observing that it was a "legitimate question ... [and] doesn't hurt anybody." The next question was why the officer had followed defendant to the garage. The State objected on the basis of relevance, but the court overruled the objection. The fourth question was whether or not it mattered that defendant was speeding "from a legal standpoint." The court ruled without elaboration that it would not ask this question. The final question was why defendant had towed police vehicles in the past for free. There were no objections to this question.

¶ 7. The court then addressed the four approved questions to defendant. Defendant, in response, described the make and model of his wrecker and the car he was towing, indicated that the speeding ticket was still pending, stated that the officer had followed him to the garage because a "service engine" light was on in his cruiser, and explained that he had declined to bill the police department for services in the past "as a courtesy." The State then recross examined defendant, asking why he had not billed the police department for services when he had testified that he could not afford to tow the officer's car for free. Defendant responded that it was a general business practice among towing companies. Defense counsel asked several additional questions on redirect. The State then recalled the officer as a rebuttal witness, inquiring as to the

reason that he had followed defendant to the service station. The officer confirmed that it was because of a "check engine" light.

¶ 8. The jury returned a verdict of guilty as charged. The court denied a subsequent motion for new trial, and later sentenced defendant to zero to thirty days, all suspended, and placed defendant on probation. This appeal followed.

¶ 9. Defendant renews on appeal the objections that he raised below to the trial court's decision to allow juror questioning. The State raises a procedural bar at the threshold, however, arguing that the claims were not adequately preserved for review because defendant failed to specifically object on the record to the court's decision to allow juror questioning after the court read the preliminary instructions to the jury. For the reasons stated below, we agree with the State's argument and conclude that defendant needed to object to the preliminary juror instructions to preserve this question for appeal.

¶ 10. This Court has continuously held that litigants must renew objections to instructions on the record in order to preserve the questions for appeal or this Court will review such issues only for plain error. See *State v. Tahair*, 172 Vt. 101, 104-05, 772 A.2d 1079, 1082 (2001); *State v. Carpenter*, 170 Vt. 371, 374, 749 A.2d 1137, 1139 (2000); *State v. Wheelock*, 158 Vt. 302, 306, 609 A.2d 972, 975 (1992). As stated in *Wheelock*, the purpose of requiring an objection after jury instructions is to give the trial court a last chance to avoid an error. 158 Vt. at 306, 609 A.2d at 975. Thus, we have viewed the requirement to make a post-charge objection as a bright-line rule, applicable even if the charge issue is discussed and resolved in a precharge conference. See *Tahair*, 172 Vt. at 104-05, 772 A.2d at 1082 (post-charge objection not made therefore objection not preserved, even though raised and ruled upon at a charge conference). As this case demonstrates, the instructions given to the jury before the commencement of the evidence can be as important as those given following the evidence. Thus, we conclude that the requirement of an objection following the giving of jury instructions applies at whatever stage of the proceedings the instructions are given. See *United States v. Sutton*, 970 F.2d 1001, 1006 n.5 (1st Cir. 1992) (defendant's failure to object to judge's preliminary statement regarding juror questioning procedure left the question unreviewable on appeal); see also *Turner v. State*, 682 N.E.2d 491, 496 (Ind. 1997) (defendant's failure to timely object to preliminary instructions constitutes waiver).

¶ 11. Although we hold that defendant failed to preserve the issue of whether juror questioning of witnesses in the trial court's

discretion should be permitted, we address this issue on the merits for reasons akin to those present in *State v. Wheelock*, 158 Vt. at 306, 609 A.2d at 975, a case in which we also reviewed defendant's claim of error despite the failure to preserve it. In *Wheelock*, we held that it would be unfair to rely upon nonpreservation because the trial judge had specifically ruled that all objections made in an earlier charge conference were preserved without a renewed objection after the charge. In essence, the ruling of *Wheelock* was made prospective. Here, although we have ruled that a post-charge objection must be stated to preserve issues related to a preliminary charge, our criminal rules do not specifically require this procedure, as they do for post-evidence instructions. See V.R.Cr.P. 30. Indeed, preliminary instructions are not yet specifically authorized in our criminal rules although we have recognized their usefulness. See *State v. Muscari*, 174 Vt. 101, 116, 807 A.2d 407, 419 (2002). Following the model of *Wheelock*, we reach the heart of defendant's challenge to juror questioning of witnesses in criminal cases for the following reasons: (1) the objection requirement is not in a rule; (2) defendant's challenge to jury questioning had been raised by specific motion and ruled upon in a written decision; and (3) the issue before us is important and needs the guidance of this Court.

¶ 12. Juror questioning is neither radical nor a recent innovation. The practice was historically part of the trial process and considered a useful tool in ascertaining the truth. See, e.g., *State v. Kendall*, 57 S.E. 340, 341 (N.C. 1907) ("[T]here is not only nothing improper in [juror questioning] when done in a seemly manner and with the evident purpose of discovering the truth, but a juror may, and often does, ask a very pertinent and helpful question in furtherance of the investigation."); see also Note, *"The Blindfold on Justice is Not a Gag": The Case for Allowing Controlled Questioning of Witnesses by Jurors*, 38 Tulsa L. Rev. 529, 533 (2003) [hereinafter *The Blindfold on Justice is Not a Gag*] (noting that juror questioning dates to the eighteenth century in England and the nineteenth century in the United States); Comment, *Juror Questions: A Survey of Theory and Use*, 55 Mo. L. Rev. 817, 817 (1990) (finding juror questioning rooted in English common law courts). Although a few courts have prohibited questioning of witnesses by juries, none have held it unconstitutional. See *State v. Culkin*, 35 P.3d 233, 253-54 (Haw. 2001) (collecting cases).

¶ 13. The vast majority of states that have ruled on the issue allow juror questioning in some form. See *State v. LeMaster*, 669 P.2d 592, 598 (Ariz. Ct. App. 1983); *Nelson v. State*, 513 S.W.2d 496, 498 (Ark. 1974); *People v. McAlister*, 213 Cal. Rptr. 271, 277 (Ct. App. 1985); *People v.*

*Milligan*, 77 P.3d 771, 779 (Colo. Ct. App. 2003); *Gurliacci v. Mayer*, 590 A.2d 914, 930-31 (Conn. 1991); *Yeager v. Greene*, 502 A.2d 980, 985 (D.C. 1985); *Watson v. State*, 651 So. 2d 1159, 1163 (Fla. 1994); *Lance v. State*, 560 S.E.2d 663, 676 (Ga. 2002); *Culkin*, 35 P.3d at 253; *Trotter v. State*, 733 N.E.2d 527, 531 (Ind. Ct. App. 2000); *Rudolph v. Iowa Methodist Med. Ctr.*, 293 N.W.2d 550, 556 (Iowa 1980); *Transit Auth. of River City v. Montgomery*, 836 S.W.2d 413, 416 (Ky. 1992); *Commonwealth v. Britto*, 744 N.E.2d 1089, 1105 (Mass. 2001); *People v. Heard*, 200 N.W.2d 73, 76 (Mich. 1972); *Hancock v. Shook*, 100 S.W.3d 786, 795-96 (Mo. 2003) (en banc); *State v. Graves*, 907 P.2d 963, 966-67 (Mont. 1995); *State v. Rodriguez*, 762 P.2d 898, 902 (N.M. Ct. App. 1988); *Flores v. State*, 965 P.2d 901, 903 (Nev. 1998); *People v. Bacic*, 608 N.Y.S.2d 452, 452 (App. Div. 1994); *State v. Howard*, 360 S.E.2d 790, 796 (N.C. 1987); *State v. Fisher*, 789 N.E.2d 222, 229 (Ohio 2003); *Freeman v. State*, 876 P.2d 283, 288-89 (Okla. Crim. App. 1994); *Boggs v. Jewell Tea Co.*, 109 A. 666, 668 (Pa. 1920); *Day v. Kilgore*, 444 S.E.2d 515, 518-19 (S.C. 1994); *State v. Johnson*, 784 P.2d 1135, 1144-45 (Utah 1989); *Williams v. Commonwealth*, 484 S.E.2d 153, 155-56 (Va. Ct. App. 1997); *State v. Munoz*, 837 P.2d 636, 639 (Wash. Ct. App. 1992); *Sommers v. Friedman*, 493 N.W.2d 393, 400-01 (Wis. Ct. App. 1992).

¶ 14. In addition to the state court decisions, of the ten federal circuits that have considered the juror questioning issue, all allow the practice in some form in the trial court's discretion. See *United States v. Richardson*, 233 F.3d 1285, 1288-91 (11th Cir. 2000); *United States v. Collins*, 226 F.3d 457, 464-65 (6th Cir. 2000); *United States v. Hernandez*, 176 F.3d 719, 722-26 (3d Cir. 1999); *United States v. Feinberg*, 89 F.3d 333, 336-38 (7th Cir. 1996); *United States v. Bush*, 47 F.3d 511, 514-16 (2d Cir. 1995); *United States v. Huebner*, 48 F.3d 376, 382 (9th Cir. 1994); *United States v. Welliver*, 976 F.2d 1148, 1154-55 (8th Cir. 1992); *United States v. Sutton*, 970 F.2d at 1004-07; *DeBenedetto v. Goodyear Tire & Rubber Co.*, 754 F.2d 512, 515-17 (4th Cir. 1985); *United States v. Callahan*, 588 F.2d 1078, 1086 (5th Cir. 1979).

¶ 15. Defendant, while acknowledging that most states have allowed juror questioning in some form, emphasizes that most of these jurisdictions discourage and limit the practice. We agree with that assessment of the decisions, but find a significant recent trend towards endorsement of the practice and emphasis on its benefits. Thus, recent decisions allow the trial courts greater freedom in utilizing juror questioning. See, e.g., *Hancock*, 100 S.W.3d at 795-96; *Fisher*, 789 N.E.2d at 229-30; *Britto*, 744 N.E.2d at 1105 (expanding *Commonwealth v. Urena*, 632 N.E.2d 1200, 1206 (Mass. 1994), which allowed juror questioning only for "important

matters" in civil cases, and holding that juror questioning may be used at trial court's discretion and "need not be limited to any particular type of case"). Many decisions conclude that juror questioning of witnesses aids in the ascertainment of truth and the overall achievement of justice in trials. See *Yeager*, 502 A.2d at 998-99 ("[I]t seems indisputable that the increased effectiveness of communication with jurors that will result if they are permitted to pose questions to witnesses will aid in finding the truth."); *Heard*, 200 N.W.2d at 76 ("It would appear that in certain circumstances, a juror might have a question which could help unravel otherwise confusing testimony. In such a situation, it would aid the fact-finding process if a juror were permitted to ask such a question."); *Flores*, 965 P.2d at 902 ("[W]e join the majority of jurisdictions which acknowledge the practice of jury-questioning as an innovation that can significantly enhance the truth-seeking function of the trial process."); *Fisher*, 789 N.E.2d at 228 ("The practice of allowing jurors to question witnesses provides for two-way communication through which jurors can more effectively fulfill their fundamental role as factfinders."); see also A. Barry Cappello & G. James Strenio, *Juror Questioning: The Verdict Is In*, Trial, June 2000 at 44 ("Overall, [juror questioning] advances the interests of justice and the search for truth by enhancing the fact-finding and decision-making function of the jurors. They are thereby able to render a rational and just verdict as opposed to one based on ignorance, confusion, speculation, or emotion."). Other courts have found that juror questioning may also increase juror understanding and participation. See *Culkin*, 35 P.3d at 253 ("Allowing jurors to ask questions of witnesses would promote better and more reliable communication, because a two-way system provides for constant clarification of messages being sent. Understanding testimony more clearly, jurors thus would be able to fulfill their basic function of finding the facts in dispute.") (internal quotations and citations omitted); *Slaughter v. Commonwealth*, 744 S.W.2d 407, 413 (Ky. 1987) (juror questioning is "encouraged in the interest of justice and to enhance the understanding of the facts and issues in a case.").

¶ 16. We acknowledge that two other highest courts, Mississippi and Nebraska, have ruled that juror questioning is prohibited in all cases. See *Wharton v. State*, 734 So. 2d 985, 990 (Miss. 1998); *State v. Zima*, 468 N.W.2d 377, 380 (Neb. 1991). Two other states, Minnesota and Texas, prohibit juror questioning in criminal cases, but their highest courts have not ruled on the issue in the civil context. *State v. Costello*, 646 N.W.2d 204, 214 (Minn. 2002); *Morrison v. State*, 845 S.W.2d 882, 888-89 (Tex. Crim. App. 1992). In addition, as defendant particularly emphasizes, some other courts have discouraged the practice of allowing jurors to question

witnesses. See, e.g., *DeBenedetto*, 754 F.2d at 516 ("[J]uror questioning is fraught with dangers which can undermine the orderly progress of the trial to verdict."); *State v. Hays*, 883 P.2d 1093, 1102 (Kan. 1994) ("[A] trial court should discourage the practice [of juror questioning] except when the benefits outweigh the risks.").

¶ 17. Even the broad acceptance of juror questioning in the appellate decisions paints an incomplete picture of support for the practice in the states. Many states have established jury policy commissions to study methods of improving juror understanding of the evidence and proceedings, among other issues. See Am. Judicature Soc'y, *Enhancing the Jury System: A Guidebook for Jury Reform* (1999). These commissions have overwhelmingly supported adoption of policies that allow juror questioning of witnesses at least in some cases. See, e.g., J. Kelso, *Final Report of the Blue Ribbon Commission on Jury System Improvement*, 47 Hastings L.J. 1433, 1508 (1996) ("The [California] Commission recommends that juror questioning be allowed in all cases subject to the discretion of the judge and the rules of evidence."); Colo. Supreme Court Comm. on Effective & Efficient Use of Juries, *With Respect to the Jury: A Proposal for Jury Reform* 6 (1997) (jurors should be permitted to submit written questions in civil cases; trial judges should permit juror questioning in controlled pilot projects in criminal cases); Council for Court Excellence, D.C. Jury Project, *Juries for the Year 2000 and Beyond* 42-3 (1998) (jurors should be permitted to submit written questions to be asked of witnesses by the trial judge in civil and criminal cases); Supreme Court of Fla. Judicial Mgmt. Council, *Jury Innovations Committee Final Report* 37-39 (2001) (jurors in both civil and criminal cases should be permitted by rule to submit written questions to the judge to be asked of witnesses); R. Creswell, *Georgia Courts in the 21st Century: The Report of the Supreme Court of Georgia Blue Ribbon Comm'n on the Judiciary*, 53 Mercer L. Rev. 1, 23-24 (2001) ("It seems intuitively obvious that juries are likely to render more informed decisions if jurors are permitted to actively participate by asking questions through the judge. . . . Giving official sanction to jury questions in the Uniform Rules will encourage this beneficial technique in jury trials, while the rules of evidence and the judge's discretion will protect the integrity of the trial process."); J. Grant, *Recent Changes to Washington's Jury Trials: A Great System Made Even Better*, 26 Seattle U. L. Rev. 431, 438-39 (2003) (Washington State Jury Commission report recommended allowing jurors to question witnesses especially in civil trials; recommendation implemented by amendments to court rules); Wy. Comm'n on Jury System Improvement, *Re-Examining Wyoming's Jury Trial Procedures* 20-25 (2000) (Supreme

Court should adopt a rule for civil trials allowing juror questioning of witnesses under appropriate procedures). These reports led numerous state legislatures and supreme courts to adopt statutes or rules allowing juror questioning of witnesses and specifying the procedure for the practice. See Fla. Stat. Ann. § 40.50 (2003) (civil cases); Ariz. R. Civ. P. 39(b)(10); Haw. R. Civ. P. 47(c); Haw. R. Penal P. 26(b); Idaho R. Civ. P. 47(q); Idaho R. Crim. P. 30.1; Ind. R. Evid. 614(d); N.H. Sup. Ct. R. 64-B; N.D. R. Ct. 6.8; Tenn. R. Civ. P. 43A.03; Tenn. R. Crim. P. 24.1(c); Wyo. R. Civ. P. 39.4. These new rules are significant because they arise out of comprehensive studies that examine the issue thoroughly and conclude that juror questioning of witnesses is and should be permissible.

¶ 18. In addition, scholarly and professional commentary is near unanimous in its support for allowing jurors to question witnesses. See, e.g., J. Connor, *Los Angeles County Trial Courts Test Jury Innovations and Find They Are Effective*, 67 Def. Couns. J. 186, 188 (2000) ("[P]eople who are active and engaged are better learners and hence better jurors."); D. Smith, *Structural and Functional Aspects of the Jury: Comparative Analysis and Proposals for Reform*, 48 Ala. L. Rev. 441, 553-78 (1997) (urging creation of "inquisitorial" jury system allowing juror questioning of both witnesses and the trial judge, juror note taking, and discussions among jurors during trial); L. Heuer & S. Penrod, *Increasing Juror Participation in Trials Through Note Taking and Question Asking*, 79 Judicature 256, 260 (1996) [hereinafter *Juror Participation*] (finding that juror questioning helps jurors understand the facts and issues being presented); Comment, *A More Active Jury: Has Arizona Set the Standard for Reform With Its New Jury Rules?*, 28 Ariz. St. L.J. 1009, *passim* (1996) (endorsing amendment to Arizona rules allowing submission of juror questions); F. Strier, *Making Jury Trials More Truthful*, 30 U.C. Davis L. Rev. 95, 154 (1996) (stating juror questions may increase juror attention and interest in case); A. Amar, *Reinventing Juries: Ten Suggested Reforms*, 28 U.C. Davis L. Rev. 1169, 1185-86 (1995) (advocates redesign of jury system to show jurors "respect" by permitting them to submit questions for witnesses); B. Dann, *"Learning Lessons" and "Speaking Rights": Creating Educated and Democratic Juries*, 68 Ind. L.J. 1229, 1230, 1241-42 (1993) [hereinafter *Learning Lessons*] (urges end to traditional "passive juror model" by permitting active juror participation through such devices as juror questioning); A. Valen, *Jurors Asking Questions: Revolutionary or Evolutionary?*, 20 N. Ky. L. Rev. 423, 438-39 (1993) (contends that allowing jurors to ask questions makes them "feel more like a part of the judiciary, and less like helpless outsiders trying to penetrate a sanctimo-

nious institution"); M. Frankel, *A Trial Judge's Perspective on Providing Tools for Rational Jury Decisionmaking*, 85 Nw. U. L. Rev. 221, 224 (1990) (stating that jurors who are allowed to ask questions are more satisfied with their experience); S. Friedland, *The Competency and Responsibility of Jurors in Deciding Cases*, 85 Nw. U. L. Rev. 190, 192 (1990) (promoting "active" jury model through such techniques as note taking and jury questioning); L. Sand & S. Reiss, *A Report on Seven Experiments Conducted by District Court Judges in the Second Circuit*, 60 N.Y.U. L. Rev. 423, 444 (1985) (finds that jurors who ask questions may feel a greater sense of responsibility and participation in the trial); A. Barry Cappello & G. James Strenio, *supra*, at 45 (arguing that juror questions can help preserve the sanctity of the judicial system). As we note *infra*, some of this commentary results from research of trials in which jurors are allowed to ask questions. The American Bar Association's Section of Litigation has endorsed juror questioning of witnesses in its civil trial practice standards. See ABA Sec. Litigation, *Civil Trial Practice Standards*, Standard 4 (1997).

¶ 19. Before we discuss defendant's arguments why we should find juror questioning of witnesses to constitute reversible error, we stress the nature of the questioning that occurred in this case pursuant to the procedures developed by the committee of this Court. See *supra*, note 2. While this case is nominally about jurors questioning witnesses, it is really about judges questioning witnesses based on questions suggested by jurors.[3] The procedures employed required the judge to review each proposed question with counsel and to screen out or rephrase questions that might be objectionable or inappropriate. This practice is intended to and does screen out questions that are adversarial. See *Yeager*, 502 A.2d at 985 (such procedures allowed "jurors to ask relevant questions while minimizing the risk of improper questions"); *Culkin*, 35 P.3d at 252 (judge's filtering of questions eliminated improper and prejudicial questions; supposed negative consequences of jury questioning, such as its possible effect on juror neutrality and a tendency to incite improper and prejudicial questions, occurs only when jurors directly question witnesses); *Britto*, 744 N.E.2d at 1106 ("The purpose of reexamination [of written juror questions] is two fold. First, it cures the admission of any

---

[3] Nebraska's decision prohibiting juror questioning of witnesses was based on a trial in which jurors questioned witnesses directly, and a juror engaged in an adversarial interrogation of a witness. Noting that proper procedures, like judge control of juror questioning, could have avoided the improper consequences of the questioning, a concurring justice wrote that the majority's absolute ban on juror questioning "is as incomprehensible as it is imprudent." *State v. Zima*, 468 N.W.2d 377, 380 (Neb. 1991) (Shannahan, J., concurring).

prejudicial questions or answers; and second, it prevents the jury from becoming adversary in its interrogation."); *Fisher*, 789 N.E.2d at 229 (decisions on whether to allow juror questions should stay with trial judge who can "examine the nature of each question in the overall context of a trial" and determine if it is improper). More important for this discussion, it employs the traditional power of the judge to question witnesses, see V.R.E. 614(b); *Neverett v. Towne*, 123 Vt. 45, 50, 179 A.2d 583, 586 (1962) (it was within authority of the trial judge to propose questions to witness); *State v. Noakes*, 70 Vt. 247, 257, 40 A. 249, 252 (1897) (the trial court may formulate and put questions to witnesses, even leading questions, to elicit admissible facts), a power long understood to be consistent with the adversary system. We do not have to reach the propriety of a procedure that allowed jurors to question witnesses directly. See *Lance*, 560 S.E.2d at 676 (juror questioning of witnesses is prohibited, but judge questioning of witnesses based on proposed questions from jurors is proper).

¶ 20. Defendant makes two main arguments why we should hold that allowing jurors to question witnesses, under the procedures used by the trial court, is improper such that we must reverse his conviction. They mirror the two main criticisms of the practice: (1) jurors who ask questions are not neutral, but instead are active participants in the adversarial process who have assumed an adversarial stance; and (2) juror questioning of witnesses is inconsistent with the State's burden of proof in a criminal proceeding because jurors might prove elements of the crime through their questioning. Upon examination, neither criticism withstands serious analysis.

¶ 21. The first criticism is discussed in detail in *State v. Costello*, one of the four decisions prohibiting juror questioning of witnesses in criminal cases. Chief Justice Blatz of the Minnesota Supreme Court outlined that court's view of the dynamics of witness interrogation and why it is inconsistent with the role of a juror:

> But in order to ask a question, a juror must first develop a hypothesis or, at the very least, respond to a perceived flaw in a party's presentation of the case before the time to deliberate has arrived.
>
> To the degree jurors are encouraged to ask questions about facts and legal issues, they are encouraged to form at least a prior tentative opinion because one cannot investigate unless one has a hypothesis about what happened in the particular criminal case. Therefore, with such encouragement, there is an increased risk that jurors will inevitably draw conclusions or settle on a given legal theory before the parties have completed

their presentations, and before the court has instructed the jury on the law of the case. While the state argues that it is human nature to *test* one's hypothesis, the traditional system's procedures and instructions have been crafted to limit such activities until both sides have presented their arguments and the jury has been instructed on the relevant law.

*Costello*, 646 N.W.2d at 210-11 (internal quotations and citations omitted); see also *Bush*, 47 F.3d at 515 ("The most troubling concern is that the practice risks turning jurors into advocates, compromising their neutrality. It is difficult for jurors to be both active participants in the adversarial process, embroiled in the questioning of witnesses, and detached observers, passing on the credibility of the witnesses and the plausibility of the facts presented.") (internal citations omitted).

¶ 22. We reject the *Costello* rationale for a number of reasons. Overall, we are particularly persuaded by Wisconsin Judge Mark Frankel's response to this charge: "It has always struck me as highly ironic that our legal system vests such a large degree of confidence in and deference to the jury's final decision, yet has so little confidence in the ability of jurors to arrive at this sacrosanct result by impartial, nonadversarial, and thoughtful means." M. Frankel, *supra*, at 223. At base, the rationale involves speculation about juror behavior, directly contrary to the instructions juries are given not to prematurely draw conclusions or deliberate. See *United States v. Johnson*, 892 F.2d 707, 713 n.4 (8th Cir. 1989) (Lay, C.J., concurring) ("Although no empirical studies address the effect of juror questions on neutrality, several commentators mention it."); *Yeager*, 502 A.2d at 986 n.16 ("[F]ears of prejudice to criminal defendants have not been realized in practice."); *The Blindfold on Justice is Not a Gag*, *supra*, at 541-42 (although some commentators and courts have held that juror questioning will affect juror neutrality, cases and articles cite to themselves and not to scientific data); B. Michael Dann, *Free the Jury*, Litig., Fall 1996, at 6 [hereinafter *Free the Jury*] (the ideal of jury passivity [espoused in decisions like *Costello*] is "based on assumptions or wishful thinking about human behavior and our adversarial system, not on empirical validation").

¶ 23. This is a subject about which speculation is unnecessary because there are a number of recent studies of actual juries that have examined whether juror questioning leads to premature conclusions or deliberation. Not surprisingly, the leading researchers on the impact of jurors questioning witnesses, and other similar procedural reforms, have aptly noted that debate over such reforms has "proceeded with entirely too much opinion and anecdotal 'evidence' and entirely too little solid data" and that

"the courts have been spectacularly unimaginative about devising methods that would help them resolve the issues." S. Penrod & L. Heuer, *Tweaking Commonsense*, 3 Psychol. Pub. Pol'y & L. 259, 262 (1997) [hereinafter *Tweaking Commonsense*]. Professors Penrod and Heuer noted that the arguments about jurors questioning witnesses involved "testable hypothesis about the impact of such questions on trial outcomes and the trial process." *Id.* at 273. They tested the hypotheses, drawing data from 67 Wisconsin trials and 160 other trials in state and federal courts in 33 states. *Juror Participation, supra,* at 256-57; see also L. Heuer & S. Penrod, *Juror Notetaking and Question Asking During Trials: A National Field Experiment,* 18 Law & Hum. Behav. 121 (1994). The cases were about half criminal and half civil. Among the hypotheses tested was the *Costello* thesis — that jurors will become advocates if allowed to question witnesses. Among their main findings are: (1) "Juror questions promote juror understanding of the facts and issues and alleviate juror doubts about trial evidence"; (2) "juror questions serve a clarifying function"; (3) "[jurors ask] appropriate questions"; and (4) "jurors . . . were neither embarrassed nor angry" when the judge did not ask their questions. *Tweaking Commonsense, supra,* at 274-77. Ultimately, Professors Penrod and Heuer concluded that: "Jurors allowed to ask questions do not become advocates rather than neutrals." *Juror Participation, supra,* at 260.

¶ 24. A recent study conducted by Nicole Mott, *The Current Debate on Juror Questions: "To Ask or Not to Ask, That is the Question"*, 78 Chi.-Kent L. Rev. 1099, 1121 (2003), echoes Professors Penrod and Heuer's findings. In this study, Mott collected 2271 juror questions asked in civil and criminal cases in both state and federal court. She used this data set to analyze how often jurors ask questions and what information is sought by questioning jurors. *Id.* at 1111-13. Mott then used the results from these two inquiries to conclude that: (1) jurors used questions not to become advocates, but rather to enhance their roles as neutral fact-finders; (2) jurors used questions to clarify evidence already presented in the trial, not to advocate for a position; (3) jurors asked questions to understand the case on their own terms as lay people immersed in a legal context; and (4) juror questions improved comprehension and helped clarify the proceedings. *Id.* at 1119-20.

¶ 25. Uniformly, the researchers have concluded that jurors who ask questions do not thereby become advocates for a particular trial result. As the studies demonstrate, the speculation is inconsistent with the empirical evidence.

¶ 26. Moreover, the concept of a jury as a passive receptacle of information on which it will make critical decisions is now recognized as totally inconsistent with how we view the process of informed decision making in other contexts. See *Tweaking Commonsense, supra,* at 262 (juror questioning of witnesses and other similar procedures are "tools of inquiry and aids to decision making that are used every day by members of a literate society"); *Learning Lessons, supra,* at 1243 ("[T]he active juror is more likely to have an effective and satisfactory learning experience, and less likely to be confused or not to remember the evidence or the law."). Active jurors, like active students, are more likely to learn and will thereby become more precise and qualified decision makers. See Friedland, *supra,* at 206-09 (arguing for a more active jury because active jurors are more accurate decision makers and, like students, are more effective than passive learners); *Free the Jury, supra,* at 6 ("The more active jurors are at trial, the more attentive they are to the proceedings."); Note, *Juror Questioning of Witnesses: Questioning the United States Criminal Justice System,* 85 Minn. L. Rev. 2007, 2023 (2001) (an advantage of juror questioning is that "[a]ctive participation focuses the jurors' attention on the important issues in the trial, which helps maintain juror alertness and increases juror memory"); S. Diamond et al., *Inside the Jury Room: Evaluating Juror Discussions During Trial,* 87 Judicature 54, 58 (2003) (study of Arizona Civil Procedure Rule 39(f) which allows jurors to discuss evidence among themselves during breaks in trial demonstrated that "[t]he interactions helped to fill gaps in [the jurors] knowledge, clarify misunderstandings, and improve the accuracy of their recall of evidence"). In our view, *Costello* trades a speculative increase in neutrality for a likely reduction in juror comprehension of the evidence, a trade-off we are unwilling to force on our trial judges.

¶ 27. Finally, we reiterate that the procedure employed, screening of questions by the trial judge, is aimed at minimizing the risk cited by *Costello,* as cases discussed above recognize. Moreover, the procedure demonstrates the inconsistency of an approach that would allow questions by judges in a bench trial, but deny that opportunity to jurors in a jury trial.[4] It was Judge Frankel's experience as a fact-finder that prompted his response, as set out above. See Frankel, *supra,* at 223. It is difficult to perceive how we can accept this role of a judge as consistent with that of a neutral fact-finder, while rejecting this role for jurors as

[4] In *Wharton v. State,* the court held, "[t]he most obvious problem with allowing jurors to question witnesses is the unfamiliarity of jurors with the rules of evidence." 734 So. 2d 985, 990 (Miss. 1998). That objection is eliminated by requiring that the judge screen questions to be sure that they elicit admissible evidence.

inconsistent with their neutrality. See *Culkin*, 35 P.3d at 254 (noting similarities between trial judge and juror questioning of witnesses and determining that allowing either to ask questions does not affect their roles in the adversarial process).

¶ 28. The second criticism — that juror questioning of witnesses prejudices the defendant because a juror might ask a question that ends up convicting the defendant — presumes that this result is fundamentally inconsistent with the State's burden of proof. Again, the criticism is voiced in *Costello*:

> In addition to our concern about the impact that juror questioning will have on juror impartiality, we also are concerned that the practice may affect the burden of proof and production. Due process requires that the state prove beyond a reasonable doubt the existence of every element of the crime charged. A defendant's due process rights are violated if the burden to disprove the existence of any element of the crime charged is shifted to the defendant. Allowing jurors to pose questions could, in some cases, elicit testimony from a witness that sufficiently proves an element of a crime, thereby relieving the state of its burden.

646 N.W.2d at 211 (internal citations omitted). There the court criticized even indirect effects on the prosecution's action. Thus, it found improper shifting of the burden of proof in the case before it because the prosecutor admitted that a juror's question caused him to respond to an affirmative defense that he had thought was very weak. *Id.* at 212.

¶ 29. The premise of the criticism is that the burden of proof must be met solely through the questions and actions of the prosecutor. The premise is wrong. As reflected in our criminal rule, V.R.Cr.P. 29(a), the sufficiency of the evidence to go to the jury is judged "after the evidence on either side is closed." That evidence can come from questions asked by the judge, see *Noakes*, 70 Vt. at 257, 40 A. at 252; V.R.E. 614(b), or even from questions asked by defense counsel. See *State v. Salazar*, 774 P.2d 1360, 1361-62 (Ariz. Ct. App. 1989). In any event, the court must make the decision on all the evidence before it, regardless of its source. See *United States v. Beck*, 615 F.2d 441, 448 (7th Cir. 1980); cf. *State v. Fanger*, 164 Vt. 48, 52, 665 A.2d 36, 37-38 (1995) (in determining motion to dismiss for lack of a prima facie case, court must consider all evidence including cross-examination by defense). There is no inconsistency between an authorization for jurors to question witnesses, exercising the same power available to the judge, and the State's burden of proof.

¶ 30. This criticism is frequently phrased in terms of an inconsistency between jurors questioning witnesses and the adversary system. The argument is that the adversary system requires evidence development solely by the parties. Of course, questioning of witnesses by the judge is also inconsistent with this view of the adversary system.

¶ 31. We remain committed to the adversary system, but not with rules so rigid that they prevent determining the truth. We have long held that the purpose of a trial is to determine the truth. See *State v. Miner*, 128 Vt. 55, 73, 258 A.2d 815, 826 (1969) ("[T]he first concern of the court should be the search for the truth, consistent with procedural due process.").

¶ 32. Even if we shared the concern that juror questioning should not develop evidence that might result in the conviction of defendant, we would not adopt the remedy urged by defendant on the record before us. None of the questions asked could remotely have contributed to defendant's conviction. Nor were they aimed to help the prosecution at the expense of the defense. They might be criticized for lacking probative value, but not for their effect on the verdict.

¶ 33. We reiterate that the procedure before us gives discretion to the judge to determine whether to solicit juror questions and to ask a particular question proposed by a juror. The remedy, if any, for inappropriate juror questions lies in effective screening by the trial judge.

¶ 34. In summary, the overwhelming endorsement in other jurisdictions of allowing jurors to question witnesses through the judge, and the lack of persuasiveness of the criticisms of the practice, lead us to hold that trial judges in Vermont have authority to allow jurors to question witnesses, through the judge, in criminal cases. The procedure should follow that employed in this case: (1) the jurors must submit the proposed questions to the judge and be made part of the record; (2) the judge must disclose the proposed questions to the parties and give them the opportunity to object or request the question be narrowed or rephrased; and (3) the judge must rule on each proposed question on the record, allowing, rejecting or modifying the question. The procedures should be explained to the parties and jurors at the commencement of the trial.

¶ 35. We further hold that the trial court in this case adopted and implemented the proper procedures and acted within its discretion in the rulings made on the questions submitted. We find no error.

*Affirmed.*