**UNITED STATES of America, Plaintiff-Appellee,**

v.

**Ralph MILLER, Defendant-Appellant.**

No. 85–2647.

United States Court of Appeals, Seventh Circuit.

Argued May 30, 1986.

Decided Aug. 28, 1986.

Julius J. Echeles, Chicago, Ill., for defendant-appellant.

Patrick J. Foley, Asst. U.S. Atty., Chicago, Ill., for plaintiff-appellee.

Before CUMMINGS, Chief Judge, FLAUM, and EASTERBROOK, Circuit Judges.

FLAUM, Circuit Judge.

The defendant Ralph Miller was a chiropractor, and owner of a clinic in Chicago, who was convicted of devising a scheme to defraud several insurance companies by submitting false and inflated medical reports and bills for people treated at the clinic. There are two questions on appeal. The first is whether the trial court erred in denying the defendant's motion to suppress a group of business and medical records the government seized from the clinic. The second question on appeal concerns the prosecution's allegedly unfair and improper cross-examination of a defense witness. We find no merit in either of the defendant's allegations and thus affirm the rulings of the district court.

## I.

The only facts relevant to this appeal concern the business records of the Associated Physicians Clinic, which was owned solely by the defendant Ralph Miller, and the cross-examination of the witnesses at Miller's criminal trial.

At various times the Associated Physicians Clinic had offices at three different locations in Chicago. While Miller kept business records at all three locations, the records were frequently moved between offices. Those records consisted of patient medical history and treatment cards, medical bills, medical reports prepared from the treatment cards, patient sign-in log books, X-rays, and bank records (including employee payroll receipts, check stubs, and deposit slips). The district court found that all of the employees of the clinic had access to all of these records. None of the records were maintained in private or restricted areas.

The district court made the following findings of fact concerning Julio Rodriguez's use of those business records:

5. Julio Rodriguez was employed by Miller to work at the 63rd Street Clinic from 1972 through 1980. Rodriguez worked as an X-ray technician but also performed the following duties with Miller's knowledge and consent:

> Shared supervision of the patient sign-in log book;
>
> Prepared and stamped the medical cards;

Performed examinations, blood tests, X-rays, EKG's, pregnancy tests;

Deposited and cashed checks at the bank;

Moved records from 505 North LaSalle Street to 63rd Street; and

Consulted medical records of 63rd Street and 505 North LaSalle Street when necessary in performing his other job duties.

6. Miller gave Rodriguez keys to the 63rd Street Clinic when Rodriguez was first employed. In July of 1980 Miller knew Rodriguez had those keys and used those keys. Rodriguez would open and close the clinic on his own. Rodriguez had Miller's permission to be in the clinic by himself. Miller gave Rodriguez permission to use all records in the clinic. Rodriguez had access to the entire premises of the clinic.

7. During 1979, Rodriguez learned, upon reading a newspaper story written by Gene Mustain, that Miller was being investigated. After reading the story, a police officer acquainted with Rodriguez contacted him. In the summer months of 1979, the officer told Rodriguez that Gene Mustain was doing an investigative report on Dr. Miller's clinics and asked Rodriguez to meet with Mustain. Rodriguez agreed and met, on one occasion, with Mustain at the officer's home. Mustain asked Rodriguez questions concerning Miller's clinic and Rodriguez answered. Mustain also urged Rodriguez to contact Postal Inspector Mason and give Mason this same information. Rodriguez agreed to speak with Mason.

8. Rodriguez first met Mason a short time later during a visit by Mason and other postal inspectors to the 63rd Street Clinic. The inspectors spoke with all staff members present in the clinic that day, asking them to cooperate in the investigation and discussing each staff member's duties. Mason and Rodriguez agreed to meet at Rodriguez' home. In late 1979, Mason came to Rodriguez' home with another postal inspector and asked questions regarding Miller's clinic, which Rodriguez answered. Subsequent-

ly, Mason telephoned Rodriguez on two other occasions to ask if any significant changes had taken place at the 63rd Street Clinic. Although Rodriguez agreed to respond to the government's investigation of Miller, he was never paid by the government, promised payment or expected any payment.

9. On July 14, 1980, Miller came to the 63rd Street Clinic where the business records were stored. Miller asked Rodriguez to store some of these records at Rodriguez' own home. Rodriguez refused to do so. At that time Miller took a small group of business records out of the clinic, as he usually did on visits to 63rd Street. Miller also told Rodriguez that "he had to remove [the records] from the [63rd Street Clinic] as soon as possible so that the authorities would not get a hold of them."

10. After Miller left the clinic with the records, Rodriguez called Inspector Mason and told him "that if he wanted the records, to come and get them, because Dr. Miller intended to remove them from the premises." Rodriguez told Inspector Mason to "have a subpoena for the records" because "we were responsible ... for them ... and since I didn't want to be blamed by anyone."

11. On July 15, 1980, Inspector Mason went to the 63rd Street Clinic and served a subpoena on Julio Rodriguez. The subpoena was issued to "Dr. Ralph Miller or Custodian of Records" and called for various records "relating to the treatment of any patients by Dr. Miller."

12. On July 15, 1980, Rodriguez was Miller's sole employee at the 63rd Street Clinic. Miller knew that Rodriguez was the only person working at the 63rd Street Clinic at that time.

13. In response to Mason's question, Rodriguez told Mason that he was the custodian of records. He had been the only employee working at the Clinic for several weeks.

14. Rodriguez also told Mason that Mason could take business records and remove them from the 63rd Street Clinic.

Mason removed the business records at that time. Rodriguez made no effort to insure that the records taken were within the terms of the subpoena. However, because of the broad language of the subpoena and the nature and volume of the records, any effort to examine the records individually would not have been feasible. Nor was Rodriguez' consent to the removal of the records tied to the subpoena, since Rodriguez would have turned the records over "with or without the subpoena."

15. Prior to July 15, 1980, a Grand Jury subpoena for business records was served on Ralph Miller personally. That subpoena called for production of the records of 22 different doctors, including Ralph Miller. At a hearing held on May 27, 1980 on the scope of that subpoena, Chief Judge Parsons suggested a clarification of the subpoena and denied the motion to quash with the provision that the government make more specific what information relating to the 22 listed doctors the government was seeking from Ralph Miller. Chief Judge Parsons also rejected a tentative Fifth Amendment argument offered by Miller, stating that business records are not privileged.

The district court then denied the defendant's motion to suppress because Rodriguez was the only employee at the clinic for more than two weeks before the records were turned over. The court below found that "Miller expressly placed all records located at the 63rd Street Clinic into Rodriguez' custody by asking Rodriguez to aid him in his efforts to remove and conceal or destroy records." The court found the subpoena served on Rodriguez met Judge Parsons' guidelines and while Rodriguez initiated the removal of records, the court below found that he was not acting as an informant for hire or at the government's direction.

The defendant was then convicted of thirteen counts of mail fraud and this appeal followed.

## II.

▮ To determine whether Miller's Fourth Amendment right was violated we need only determine whether Rodriguez was a "custodian of records" that the government sought to obtain through their second subpoena. That determination is inherently factual, and thus the trial court's ruling on the motion to suppress should not be overturned unless it is clearly erroneous. *United States v. Santucci*, 674 F.2d 624, 631 (7th Cir.1982). It also raises interesting and important questions concerning an agent's actual and apparent authority.

▮ As a general rule, all the government must show is that the alleged "custodian of records" had *apparent*, opposed to *actual*, authority to dispose of the records. This is a clear corollary of the principle that whether a search is "reasonable" under the Fourth Amendment depends on what the police know, not on whether what they know turns out to be true. *Baker v. McCollan*, 443 U.S. 137, 99 S.Ct. 2689, 61 L.Ed.2d 433 (1979). *Cf. Scott v. United States*, 436 U.S. 128, 135–39, 98 S.Ct. 1717, 1722–24, 56 L.Ed.2d 168 (1978) (test under the Fourth Amendment is objective). If all the facts known to the police suggest that the person claiming to be a custodian of the records had sufficient authority, then the court should not suppress that evidence voluntarily given to the police.

For example, if a person who ought to know had told the police in this case that Rodriguez was the custodian of the clinic's records, and everything about Rodriguez lent credence to that impression, then there is no ground on which to suppress the evidence even if Rodriguez actually used the documents less frequently than everyone thought he did. The police may not accept only Rodriguez' bald assertion that he is a custodian, but must make a reasonable inquiry concerning the objective factors (that we will discuss later) that make up an actual "custodian of records." In short, the police need not get a warrant if someone with apparent authority to do so consents to the search and thus we can not

call "unreasonable" police conduct that on the basis of everything known to them was appropriate.

The factors the police should consider when making their objective determination of whether someone has apparent authority are by necessity the same factors that make up actual authority. To determine apparent authority one must look for indicia of actual authority. The Supreme Court has generally held that what employees "observe in their daily functions is undoubtedly beyond the employer's reasonable expectation of privacy," and thus if disclosed by an employee, is beyond the protection of the Fourth Amendment. *Marshall v. Barlow's Inc.*, 436 U.S. 307, 315, 98 S.Ct. 1816, 1821, 56 L.Ed.2d 305 (1978); *United States v. Ziperstein*, 601 F.2d 281, 289 (7th Cir.1979). That general proposition is subject to many qualifications. In *Ziperstein* we condoned the seizure, and admission into evidence, of a group of pharmaceutical records turned over to the government by a pharmacist who was employed at defendant Ziperstein's clinic. We stated that there is "nothing to suggest any impropriety in a pharmacist obtaining control over the records which serve as the basis of his daily activities." 601 F.2d at 289. Similarly, a corporate officer is a natural custodian of documents relating to the incorporation of that business. *United States v. Billingsley*, 440 F.2d 823 (7th Cir.), *cert. denied*, 403 U.S. 909, 91 S.Ct. 2219, 29 L.Ed.2d 687 (1971). However, if the documents seized are not related to the duties of the employee who took them, then their use could violate the Fourth Amendment. *Knoll Associates, Inc. v. FTC*, 397 F.2d 530 (7th Cir.1968). If the employee never had legitimate access to the documents in dispute, then he is clearly not a custodian of those documents. *United States v. Stein*, 322 F.Supp. 346 (N.D.Ill.1971). In other words, there is a difference between *legitimate* access and mere access, and that difference is a product of the *purpose* for which an individual is given access. Access alone is not enough.

For example, possession of a key by a janitor or maid does not make that person a "custodian" of the premises or of the records kept on those premises. Possession of a key in order to clean the room does not give the possessor the authority to "use" the premises or documents for any other purpose. Possession of a key for one purpose does not amount to automatic authority to consent to a search of the premises to which that key gives the employee access—and an employee's authority to consent to such a search is limited by the purposes for which he was given the key. The power to so limit the authority of an agent, as we will discuss, comes from the privacy interests of the owner of the documents. The owner of the documents can limit both the amount of access and the purpose of that access.

The district court made factual findings that indicate the existence of actual authority—which is what is required to demonstrate apparent authority. We hold that those factual findings are not clearly erroneous. As an X-ray technician, and eventually the sole employee at the defendant's clinic, Rodriguez often came into contact with many, but not all, of the documents he turned over to the government. Here, the documents did go beyond "the basis of [Rodriguez's] daily activities," *Ziperstein*, 601 F.2d at 289, in that Rodriguez did not use them every day, but the fact remains that Rodriguez did *use* many of the documents in order to carry out his duties. More importantly, Rodriguez's job duties became so wide and varied by July of 1980 that he had to have access to those documents because he might have had to use them. This is crucial, even if in hindsight we find that he did not use them.

That would usually be all that would be required to find that the seizure was "reasonable;" but our inquiry cannot end here because the purpose for which Rodriguez had access was expressly limited by the owner of the documents and this fact was known by the police. The district court found that Dr. Miller had asked Rodriguez to take some of the business records

to his own home in order to hide them from the "authorities." That express request to obstruct justice, which Rodriguez communicated to the police, was a limitation on Rodriguez's authority to turn the documents over to the police. Certainly, the owner of documents can protect his privacy interests by limiting the power of his agent. An employer who allows his employee access to his files does not have an all-or-nothing choice: access for one purpose does not mean access for all purposes. Dr. Miller had a right to expressly limit Rodriguez's authority to dispose of the clinic's records. Dr. Miller exercised that right when he told Rodriguez to keep the documents from the police. The police knew that Rodriguez's authority had been so limited, and therefore we cannot find that the police could have relied on any appearance of authority that Rodriguez might have had. Dr. Miller's order to obstruct justice also clearly put a limitation on Rodriguez's actual authority. That is the general rule.

■ This case, however, is the exception to that rule. When Miller asked Rodriguez to store some of the documents at his house in order to keep them from "the authorities," he was expressly making Rodriguez a custodian for the purpose of obstructing justice. We hold, as a general proposition that is subject to qualification, that when an employer gives an employee access to documents intentionally and knowingly in order to obstruct justice, that employee is a custodian of those records for the purposes of a valid subpoena or seizure. Any other result would clearly not be in the best interest of justice and would stand the access/purpose test on its head. In order to avoid a valid subpoena Dr. Miller would need only give his business records to an employee, order that employee not to turn them over to the police, and then Dr. Miller could claim without perjury, that he gave everything in his custody to the police. If Rodriguez had allowed his employer to destroy the documents, or even worse, had followed his employer's orders and had destroyed or hidden the documents, then he too could have been found guilty of obstruction of

justice. Thus, we find there must be an exception to general agency principles for purposes of a criminal subpoena. This is a bright line rule that will be easy for law enforcement to apply—which is a more than relevant consideration. Policemen are better suited by training and experience to discern unlawful conduct than they are to divine the subtleties of agency law.

One possible qualification to this rule in this case is that Rodriguez had a relationship with the government that Miller argues made him a "government informer." We need not reach that issue because we disagree with the defendant's description of Rodriguez's relationship with the government. We agree with the district court's conclusion of law that although Rodriguez agreed to cooperate with the government, he was not acting as an informant for hire or at the government's direction. Thus, in this case his cooperation with the government, particularly after he was given custody of the documents in order to hide or destroy them, does not vitiate his consent. There is no evidence that the subpoena in this case was used as a subterfuge between the government and a government informer in order to get around Judge Parsons' order to limit the first subpoena. While Rodriguez was not acting solely as a "concerned citizen," but had been initially contacted by a Chicago police officer, he was acting as an employee who had just been asked to assist in a crime.

We hold that in the particular factual circumstance of this case, the district court's finding that Rodriguez was a custodian of the documents that were turned over to the government was not clearly erroneous. Thus, the district court's denial of the motion to suppress is affirmed.

### III.

■ The defendant also claims that he did not receive a fair trial because the prosecution asked the defendant, and later a defense witness, improper questions and then failed to offer rebuttal evidence to

"prove-up" the impeachment. *See United States v. Harris*, 542 F.2d 1283, 1307 (7th Cir.1976); *United States v. Bohle*, 445 F.2d 54, 73–74 (7th Cir.1971). We find that defense counsel clearly waived his objection to the defendant's cross-examination by explicitly stating that the prosecution did not have to go ahead with its offer to "prove-up" its allegations because the district court stated it would not rely on the disputed allegations.

This was a trial to the bench, and while as a philosophical matter we appreciate the defendant's observation that "the court is not super-human," as a legal matter the district court is presumed to have considered only relevant and admissible evidence in reaching its factual findings. *United States v. Green*, 735 F.2d 1018, 1026 (7th Cir.1984). The trial court specifically stated it would disregard the disputed evidence from its evaluation of defendant's guilt, and despite any court's "many human frailities," we must take that statement as true.

## IV.

For the foregoing reasons, the district court is affirmed.