352 Conn. 355 JULY, 2025 355

State *v.* Maharg

STATE OF CONNECTICUT *v.* JAMES MAHARG
(SC 20855)

Mullins, C. J., and McDonald, D'Auria, Ecker,
Alexander, Dannehy and Bright, Js.

*Syllabus*

Convicted, after a trial to a three judge panel, of murder and tampering with
or fabricating physical evidence, the defendant appealed to this court. The
trial court had suppressed certain statements the defendant made to the
police during a station house interrogation, including the defendant's confes-
sion that he had killed the victim, on the ground that those statements were
not voluntarily made. The trial court, however, declined to suppress certain
other statements the defendant had made after the station house interroga-
tion ended and while he was in the hospital, including another confession
that he had killed the victim, on the ground that those statements were
spontaneous and freely made. On appeal, the defendant claimed, inter alia,
that he was deprived of his federal and state constitutional rights to due
process and against self-incrimination because, although the trial court had
properly suppressed his station house statements, the prosecutor improperly
relied on those statements in securing his murder conviction. The defendant
also claimed that the admission into evidence of his hospital statements
violated his constitutional right to due process because those statements
were a product of the station house interrogation and confession. *Held*:

The defendant's unpreserved claim that the prosecutor and the trial court
had improperly relied on his station house statements in securing his murder
conviction and in finding the defendant guilty, respectively, failed under the
first prong of *State* v. *Golding* (213 Conn. 233), as the record was inadequate
for this court's review of that claim.

The defendant's claim was premised on the argument that, to develop their
own opinions, three experts who testified at trial, two for the state and one
for the defendant, relied in part on an investigative report prepared by the
Office of the Chief Medical Examiner (OCME) that referred to the suppressed
station house confession, but the defendant failed to demonstrate that the
state's experts knew of or had reviewed the OCME report in reaching the
conclusions about which they respectively testified, and the defendant also
failed to demonstrate, with respect to all three experts, that the references
to the station house confession contained in the OCME report affected or
influenced their respective findings and testimony.

Even if the trial court improperly admitted into evidence the statements
that the defendant had made while he was in the hospital, any error was
harmless, as those statements did not materially impact the court or the
result of the trial because the court did not rely on them in reaching its

State *v.* Maharg

conclusions, and, thus, the court would have found the defendant guilty beyond a reasonable doubt in the absence of those statements.
(*Three justices concurring in one opinion*)

Argued March 10—officially released July 8, 2025

*Procedural History*

Information charging the defendant with the crimes of murder and tampering with or fabricating physical evidence, brought to the Superior Court in the judicial district of Danbury, geographical area number three, and tried to a three judge panel, *Pavia, Dayton* and *Medina, Js.*; thereafter, the court granted in part and denied in part the defendant's motion to suppress certain evidence; finding and judgment of guilty, from which the defendant appealed to this court. *Affirmed.*

*Eric Del Pozo*, with whom were *Joette Katz* and *Elizabeth H. Buchanan*, for the appellant (defendant).

*Laurie N. Feldman*, assistant state's attorney, with whom were *Deborah Mabbett*, supervisory assistant state's attorney, and, on the brief, *David R. Applegate*, state's attorney, and *Mary-Caitlin E. Harding*, assistant state's attorney, for the appellee (state).

*Opinion*

MULLINS, C. J. Following a bench trial before a three judge panel, the defendant, James Maharg, was found guilty of murdering his husband, Thomas Conley, in violation of General Statutes § 53a-54a (a). In connection with the murder, the trial court also found him guilty of tampering with or fabricating physical evidence in violation of General Statutes § 53a-155. On appeal, the defendant raises two claims, challenging only his murder conviction. The defendant does not challenge his conviction of tampering with or fabricating physical evidence.

First, the defendant claims on appeal that he was deprived of his federal and state constitutional rights

State *v.* Maharg

to due process and against self-incrimination because, notwithstanding the fact that the trial court properly suppressed statements he had made during an almost thirteen hour police interrogation, including his confession that he murdered Conley with a hatchet,[1] the prosecutor and the court extensively relied on those statements in bringing about his conviction of murder. He further asserts that the three experts who testified at trial relied on an investigative report by the Office of the Chief Medical Examiner (OCME report) that referred to the suppressed confession to develop their expert reports and findings, rendering the defendant's trial fundamentally unfair.

Second, the defendant claims that the trial court erred in admitting statements he had made while in the emergency room, in which he confessed to the murder. He argues that, because those statements were made shortly after, and were a product of, his earlier, involuntary confession, the taint from that earlier confession carried over and rendered his hospital confession equally involuntary and violative of due process. We reject both claims. Accordingly, we affirm the judgment of the trial court.

The trial court found, or reasonably could have found, the following facts. On March 20, 2019, at approximately 2 a.m., the defendant frantically called 911, and, after he was connected to a dispatcher, he yelled: "My husband is dead! My husband is dead!" The defendant relayed the following story to the dispatcher. He explained that he and Conley had been drinking a great deal through-

---

[1] The police discovered both a hatchet and an axe during a sweep of the defendant's property. Although the defendant, during the police interrogation, confessed to murdering Conley with the "hatchet" and clarified that he probably would not have used "the axe because [it was] difficult to get to," some of the subsequent investigatory reports and expert testimony indicated that the instrument in question was an axe.

State *v.* Maharg

out the day[2] and that, at some point during the evening, Conley fell and hit his head on the kitchen cabinet and started to bleed heavily. The defendant said that he tended to Conley's gash by stopping the bleeding with a roll of paper towels and that he brought Conley upstairs to bed.[3] The defendant told the dispatcher that he had just awoken and had found Conley at the bottom of the stairs. When the dispatcher asked the defendant if Conley was "beyond help," the defendant responded, "yes . . . he's cold as a rock." While rapidly panting, the defendant, unprompted, began talking about the couple's financial problems and frequent drinking.

Approximately twenty minutes later, a paramedic, Justin Walsh, arrived at the defendant's residence. After the defendant secured his dogs to let Walsh in, he entered the house and noticed Conley's naked body lying in an unnatural position, at the bottom of the stairs. Walsh examined Conley and determined that he was deceased. During the examination, Walsh noticed large and small wounds that were filled with clotted blood on the top of Conley's head. Based on the clotting, Walsh believed that the wounds were not fresh. Despite the visible head wounds, there was no noticeable blood on Conley's body or on the surrounding floor. Walsh noted that Conley's body was stiffened by rigor mortis and was cold, which indicated that Conley had been dead for several hours. The defendant told Walsh the same version of events that he had told to the dispatcher.[4]

---

[2] The defendant's blood alcohol concentration was not tested. Conley's postmortem blood alcohol concentration was recorded at 0.393 in the toxicology report. An associate medical examiner testified that this amount would be considered an elevated level for a chronic alcohol user.

[3] The defendant did not immediately call 911.

[4] The defendant explained to Walsh that Conley had fallen, injuring himself earlier in the night. He told Walsh that he had helped get Conley upstairs to bed before they had both passed out. Then, sometime later, he woke up to hearing Conley fall down the stairs. When he went downstairs and found Conley at the base of the stairs, that is when he called 911.

State *v.* Maharg

Shortly thereafter, Troopers Isaiah Gonzalez and Laurence Gregg arrived on the scene. When Gregg arrived on the scene, he audio-recorded his interaction with the defendant, who can be heard admitting that there was no one else in the house but him, Conley, and their dogs. At approximately 4 a.m., Gonzalez transported the defendant to the State Police Troop A barracks in Southbury. Initially, Gonzalez and Detective Jared Barbero interviewed the defendant for approximately one hour at the police station. Then, Detective Ed Vayan joined Barbero, and, together, they interviewed the defendant for an additional twelve hours. The interview was video-recorded. On multiple occasions during the lengthy interview, the defendant asked Barbero and Vayan to terminate the interview, a request that was not heeded by the detectives. The defendant also appeared to be visibly shaking, and Barbero noted that he could "see the withdrawal all over [the defendant]."

After being advised of his *Miranda* rights,[5] the defendant signed his name on the waiver form. Barbero and Vayan commented on the defendant's unusual level of shaking that made it difficult for him to even scrawl his name on the form. Toward the end of the interview, the defendant verbally confessed to killing Conley with a hatchet.[6] During the nearly thirteen hour interrogation, the defendant vomited numerous times. Finally, after the defendant had an apparent seizure, at approximately 5 p.m., he was transported to Waterbury Hospital for alcohol withdrawal treatment. Trooper Matthew Geddes accompanied him.

Once at the hospital, Geddes remained in the hallway outside of the defendant's room, approximately seven to ten feet away from the defendant. About two hours

___

[5] See *Miranda* v. *Arizona*, 384 U.S. 436, 478–79, 86 S. Ct. 1602, 16 L. Ed. 2d 694 (1966).

[6] As we noted in this opinion, the defendant filed a motion to suppress, which the trial court granted only with respect to this confession.

State *v.* Maharg

after arriving, the defendant woke up and, unprompted, asked, "where is my husband?" Geddes logged the comment, as required by police policy, but did not acknowledge or respond to the defendant. Thirty minutes later, the defendant declared: "[M]y life is ruined. I murdered [Conley]. How do I tell people I killed my husband?" Once again, Geddes logged the comment and did not respond. The next day, while still in the hospital, the defendant requested to speak with Barbero. In the recorded interview, the defendant admitted to pushing Conley into a kitchen cabinet but denied bludgeoning him. Shortly thereafter, the police arrested the defendant and charged him with murder and tampering with or fabricating physical evidence.

Meanwhile, investigation of the crime scene revealed a different story from the one narrated by the defendant. At the scene, Detective Jamie Pearston recovered a bloodstained robe in the living room that Conley likely wore at some point during that evening. Additionally, Detective Jeremy Combes photographed three elliptically shaped bloodstains that were deposited in a downward direction in the kitchen. There was also a large bloodstain on the kitchen floor, which, the investigators determined, was where the first bloodshed event occurred.

Furthermore, despite the defendant's saying that he stopped Conley's bleeding before bringing him up to bed, there was a significant amount of blood upstairs. There were saturation stains on the bed and the pillows in both bedrooms. "[S]patter stains," as well as "small, circular stains," caused by "blood drops that are released from an object in motion," were also found near the north bathroom doorway. The investigators determined that the numerous bloodstains upstairs indicated that there was a second event that resulted in bloodshed, contrary to the defendant's story. However, the investigators could not pinpoint the exact location in the

State *v.* Maharg

upstairs portion of the house where the second blood-shed event had occurred.

Before trial, the defendant filed a motion to suppress the recorded verbal confessions that he had made during the thirteen hour station house interview (station house confession) and the statements overheard by Geddes at the hospital (hospital confession).[7] He claimed that the police had violated his constitutional rights under both the federal and state constitutions. The trial court held a hearing on this motion during the trial to avoid the duplicative questioning and cross-examination of the relevant witnesses. The trial court ultimately made two oral rulings on the defendant's motion to suppress, granting it in part and denying it in part. Before the defense presented its case, the trial court issued a written opinion, which articulated in greater detail the grounds for its oral rulings on the motion to suppress and the facts that it relied on in reaching its conclusions.

Specifically, the trial court suppressed the statements the defendant had made during the station house confession. The court concluded that the statements were not voluntarily made. In support of its decision, the court relied on the failure of the detectives, Barbero and Vayan, to honor the defendant's repeated requests to terminate the interview and to ensure that he understood the *Miranda* warnings. The court also determined that Barbero and Vayan disregarded the defendant's urgent need for medical care, even though the defendant showed obvious signs of physical distress.[8] The

_____

[7] The defendant did not seek to suppress the statement he gave to Barbero at the hospital.

[8] The trial court found that "Barbero and Vayan talked about the defendant's need to sober up and observed the defendant shaking to the point that he could neither hold a cup of coffee steady nor legibly sign his own name [on] the *Miranda* form." The court noted that, during the interview, Barbero commented that he could "see the withdrawal all over [the defendant]." (Internal quotation marks omitted.) Ultimately, the court determined that "Barbero and Vayan disregarded the defendant's obvious and increasingly urgent need for medical care." At trial, Barbero testified that state police

State *v.* Maharg

court, however, denied the defendant's motion to suppress the hospital confession on the ground that that confession was admissible because it was spontaneous and freely made.

At the conclusion of the trial, the trial court found the defendant guilty of murder and tampering with or fabricating physical evidence.[9] In its written memorandum of decision, the court found "that the defendant used a weighted and sharp object to repeatedly bludgeon [Conley] over the head, a vital area of the body." Furthermore, the court reasoned that the fact that the defendant had the ability to call for help but failed to summon treatment for a grievous wound "is consistent with an antecedent intent to cause death." (Internal quotation marks omitted.) The court also found that the defendant had attempted to stage the scene to make it appear as if Conley had fallen down the stairs. The court concluded that "[t]he cumulative force of the defendant's actions and inactions supports the inference that the defendant had the requisite intent to kill [Conley]. This includes, but is not limited to, the evidence that the defendant (1) used a sharp-edged weapon to inflict [Conley's] injuries, which caused substantial

policy requires bringing a suspect exhibiting signs of alcohol withdrawal to a nearby medical facility. Given the disturbing facts of this interrogation, we are dismayed at the failure of the police officers to follow that policy and to obtain medical care for the defendant in a more expedient manner.

[9] The conviction of tampering with or fabricating physical evidence was based on the fact that the trial court found beyond a reasonable doubt that the defendant had "tampered with the crime scene [by] attempting to remove blood from the kitchen floor, [from] the upper landing of the stairs, and from [Conley's] head and body," and that the defendant had moved Conley's body to the bottom of the stairs, "as evidenced by the facts that (1) there was no blood under [Conley's] body, showing that he did not die in that location, (2) [Conley's] leg was stiff and raised off the ground, showing that the defendant [had] moved his body to that location after [Conley] was already in a state of rigor [mortis], and (3) [Conley] had lividity on the posterior of his body, indicating that he was on his back after death, rather than on his stomach, as he was found when the police arrived."

State *v.* Maharg

blood loss, (2) failed to seek medical help while [Conley] bled out, (3) dragged [Conley's] body, and (4) lied to the 911 dispatcher, the paramedic, and the responding police officers regarding the cause of [Conley's] injuries.''

Lastly, the trial court noted that, even though it did not suppress the hospital confession, the evidence established the defendant's guilt beyond a reasonable doubt even without that confession. The court sentenced the defendant to a total effective sentence of thirty-five years of imprisonment, followed by ten years of special parole. This appeal followed.

I

The defendant asserts that, even though the trial court properly suppressed his station house confession, the state ''extensively relied on its tainted fruits in bringing about [the defendant's] conviction [of] murder.'' The defendant claims that this deprived him of a fair trial, as guaranteed by the due process clauses of both the federal and state constitutions, and of his federal and state constitutional rights against self-incrimination. Specifically, the defendant points to the testimony of three witnesses as being improperly tainted by the suppressed station house confession, namely, Jacqueline Nunez, an associate medical examiner; Trooper Mark Davison, an expert in bloodstain pattern analysis; and the defendant's own expert, Mark Taff, a forensic pathologist.

At trial, although the defendant filed a motion to suppress the station house confession, he made no claim that the confession affected other parts of the trial or the previously mentioned expert witnesses. The defendant's failure to raise this claim renders it unpreserved.[10] Given the constitutional nature of the claim,

---

[10] The defendant contends that, after being found guilty but before sentencing, he personally raised the claim that, even though the trial court properly suppressed the station house confession, that confession nevertheless affected his right to a fair trial because the prosecutor and the trial court extensively relied on it to bring about his murder conviction. We note that

State *v.* Maharg

however, we will employ our familiar *Golding* analysis to address his unpreserved claim. See *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989); see also *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015) (modifying third prong of *Golding*).[11] In doing so, we conclude that the defendant's claim fails under *Golding*'s first prong because the record is not adequate for review.

In the present case, the defendant asserts that the testimony of Nunez, Davison, and Taff was tainted by the suppressed station house confession. Particularly, the defendant claims that each of these witnesses developed his or her opinion based in part on the OCME report, which referred to the suppressed confession. To sustain the validity of his claim, the defendant would need to demonstrate that these witnesses knew of and had reviewed the OCME report in reaching their conclusions about which they testified and that the references to the station house confession contained in the OCME report affected each expert's conclusion. We reject the defendant's *Golding* claim because the record is not adequate for this purpose. We address this issue with respect to each expert in turn.

the defendant was still represented by counsel at that time, and his counsel did not raise this claim to the trial court. In fact, the court, through the panel's presiding judge, explained to the defendant that he "need[ed] to address that with [his] attorney and [that] there [were] appropriate ways for [him] to address that exact issue . . . ." The presiding judge was "certain that [defense counsel would] advise [him] as to how to do that." Indeed, the judge further explained to the defendant that his counsel could pursue the claim in a motion for a new trial. Thereafter, defense counsel moved for a new trial but did not pursue the claim that the defendant now raises on appeal. As a result, this claim was not preserved.

[11] A defendant may prevail on an unpreserved claim under *Golding* when "(1) the record is adequate to review the alleged claim of error; (2) the claim is of constitutional magnitude alleging the violation of a fundamental right; (3) the alleged constitutional violation . . . exists and . . . deprived the defendant of a fair trial; and (4) if subject to harmless error analysis, the state has failed to demonstrate harmlessness of the alleged constitutional violation beyond a reasonable doubt." (Footnote omitted.) *State* v. *Golding*, supra, 213 Conn. 239–40; see *In re Yasiel R.*, supra, 317 Conn. 781.

State *v.* Maharg

A

At trial, Nunez testified that she performed an autopsy on Conley on March 21, 2019. Nunez also testified that, as a result of the autopsy, she concluded that the cause of Conley's death was "chop wounds of the head," the mechanism of his death was exsanguination (loss of blood), and the manner of his death was homicide. She also testified about Conley's death certificate, which she signed on March 21, 2019. Under the first prong of *Golding*, in order for this court to consider the defendant's claim, the record must contain sufficient facts for this court to determine whether Nunez had read the OCME report before completing the autopsy and whether that report had influenced the results of the autopsy report or the death certificate. The record is devoid of such evidence.

Nunez testified that, prior to conducting the autopsy on Conley, she had received "some of the preliminary investigative information." She also testified that she could recall only that "there was a concern because of statements that had been made [by the defendant] at the scene and . . . [that the scene] was treated as suspicious from the beginning." Nunez further testified that she did not remember whether she had been informed that the police had found an axe during their sweep of the property. Notably, Nunez testified that she was not sure whether she had reviewed the OCME report prior to conducting the autopsy on Conley, but she implied that it was unlikely because the OCME report was certified one week *after* she had conducted the autopsy. Therefore, the record is inadequate for us to determine whether Nunez possessed a copy of the OCME report when she conducted the autopsy, let alone to consider whether that report influenced the findings contained in the autopsy report or the death certificate.

The defendant asserts that there was evidence that Nunez necessarily had reviewed the OCME report prior

State *v.* Maharg

to conducting the autopsy because she testified that she had received "preliminary information" from the medical investigator and because General Statutes § 19a-406 (b)[12] requires the Office of the Chief Medical Examiner "to perform autopsies in connection with the investigation" of certain deaths. We disagree. There is no requirement in § 19a-406 that the person conducting the autopsy review the OCME report prior to conducting the autopsy. Rather, § 19a-406 (a) prescribes the types of deaths that the chief medical examiner must investigate, identifies the individuals who may perform or request an autopsy, and requires that "[t]he findings of the investigation at the scene of death" and the autopsy "be filed in the Office of the Chief Medical Examiner." More definitively, Nunez testified that she did not know if she was in possession of a copy of the OCME report when she performed the autopsy on Conley and completed his death certificate. Therefore, even if this court were to consider the requirements of § 19a-406, they do not provide the necessary factual record to review the defendant's claim.

Simply put, the defendant did not establish a factual basis for this court to determine whether Nunez reviewed the OCME report before conducting the autopsy and whether her findings and testimony were influenced by the references to the station house confession contained in the OCME report. "If the facts revealed by the record are insufficient, unclear or ambiguous as to whether a constitutional violation has occurred, [this court] will not attempt to supplement or reconstruct the record, or to make factual determinations, in order to decide the defendant's claim." *State* v. *Golding*, supra, 213 Conn. 240. Accordingly, we conclude that

---

[12] Although § 19a-406 was amended during a special session in July, 2020; see Public Acts, Spec. Sess., July, 2020, No. 20-1, § 36; that amendment has no bearing on the merits of this appeal. In the interest of simplicity, we refer to the current revision of the statute.

State *v.* Maharg

the evidence is not sufficient to review the defendant's claim regarding Nunez.

B

Similarly, the record is inadequate to review the defendant's claim regarding Davison. Davison testified first about the general methodology for performing bloodstain pattern analysis and the limitations of that analysis. He explained that he had reviewed crime scene photographs and reports, and that he had inspected some of the other items of evidence in reaching his conclusions. Ultimately, Davison testified about utilizing the photographs to determine where bloodstains were found throughout the house and described the various bloodstain definitions and what they may indicate. He did not testify about the cause of Conley's death, who caused Conley's death, who moved Conley, who altered the bloodstains, or what instrument caused the stains.

On direct examination, Davison testified that he had a copy of the OCME report in his possession when he prepared his own report, but he was not asked whether the OCME report impacted his findings. Davison explained that he reached his conclusions based on an analysis of "the scene . . . ." Defense counsel also did not question him as to whether the OCME report influenced his report. Rather, defense counsel's cross-examination focused on the possibility that the transfer stains had been caused by the dogs, insofar as they may have walked through or licked up the blood.

Moreover, Davison, in his findings, did not refer to the OCME report in general or to the references to the station house confession contained therein, and there is nothing in the record to demonstrate what impact, if any, the suppressed statements had on his findings.[13]

---

[13] To the extent the defendant points to the fact that Davison testified that he had a copy of "Barbero's interrogation report," the record is also inadequate to review that claim. This is because it is unclear from the record

State *v.* Maharg

Indeed, given the scientific nature of Davison's testimony and the fact that he did not reach a conclusion about the cause or manner of Conley's death, there is no record to credit the defendant's speculative claim that Davison's testimony was improperly tainted by the station house confession.

C

The defendant also claims that Taff's testimony was tainted by the station house confession because the prosecutor referred to it in her cross-examination of Taff and in her closing argument. In response, the state asserts that the prosecutor did not taint Taff's testimony by referencing the station house confession and that, to the contrary, Taff spontaneously mentioned the OCME report during his testimony because it was defense counsel, not the prosecutor, who had provided the OCME report to Taff, the defense's own expert witness, whom defense counsel called to challenge Nunez' conclusions.

Our review of the record confirms that the prosecutor did not question Taff about the defendant's station house confession. On cross-examination, the prosecutor asked Taff if he knew about the defendant's hospital confession, which had not been suppressed. The prosecutor asked, "[a]re you aware that [the] defendant admitted to the police that 'my life is ruined, I murdered [Conley], how do I tell people I killed my husband?' " The language of the prosecutor's question was a verbatim recitation of the defendant's unsuppressed hospital confession, in which the defendant said: "[M]y life is ruined. I murdered [Conley]. How do I tell people I killed my husband?" To the extent that there is any ambiguity about whether the defendant thought that the prosecutor's use of the phrase "admitted to the

what was contained in Barbero's report, as the report was not entered into evidence at trial.

State *v.* Maharg

police'' referred to the suppressed station house confession, the record is inadequate on this point.

It was Taff who referenced the OCME report, by stating that he ''remember[ed] [the defendant] making some incriminating statements about . . . using an axe . . . in the [OCME] report . . . .'' Taff then testified that he took the OCME report into consideration when conducting his analysis, but he failed to explain how the report affected his conclusions. The prosecutor followed up by asking Taff, ''and yet . . . you're still here, and you're indicating that it's accident by suicide?'' Taff responded: ''I said that this could be an accident because it could be self-injurious, self-inflicted types of injuries. I did not call this a clear-cut suicide.'' At no point, however, did either the prosecutor or Taff expressly refer to the station house confession. More important, Taff never suggested that the suppressed statement influenced his opinion. Under these circumstances, the record is inadequate to review the defendant's unpreserved claim that the station house confession tainted Taff's testimony.

The defendant also claims that the prosecutor, during her closing argument, improperly referenced Taff's allegedly tainted testimony. We reject this claim because the prosecutor, during her closing argument, did not refer to the station house confession but, instead, merely argued that Taff had not reviewed the ''statements from the defendant,'' which we take as a reference to the unsuppressed hospital confession or to the unchallenged statement that the defendant had given to Barbero while at the hospital. Thus, the record is devoid of evidence to establish the factual predicate for the defendant's claim—that the prosecutor referred to the station house confession—and the claim is, therefore, unreviewable.

To summarize, we conclude that the defendant's claims regarding the suppressed station house confes-

370 JULY, 2025 352 Conn. 355

State *v.* Maharg

sion fail the first prong of *Golding* and are unreviewable.[14]

II

The defendant claims that the admission into evidence of the hospital confession violated his right to due process because the statements were a product of the thirteen hour station house interrogation and confession. In response, the state contends that, even if we assume that evidence of the hospital confession was improperly admitted, the state has established beyond a reasonable doubt that any impropriety was harmless. Specifically, the state asserts that any error was harmless because, in its memorandum of decision, the trial court explained that, even if it did not consider the hospital confession, the other evidence established the defendant's guilt beyond a reasonable doubt.[15] We agree with the state.

---

[14] To the extent the defendant raises a general claim that his constitutional rights were violated because the trial court failed to step in to prevent the use of the station house confession, even though the statements the defendant had made during the confession had "spread like wildfire into nearly all other material aspects of this case," even beyond the three witnesses he has identified, we conclude that the claim is inadequately briefed. Other than the testimony of the three witnesses that we have addressed in this opinion, the defendant does not point to any specific aspect of the trial that was impacted by his station house confession. Accordingly, we decline to review this general claim.

[15] In his reply brief, the defendant asserts that this court cannot rely on the trial court's observation regarding the defendant's hospital confession to conclude that its admission into evidence was harmless because, as this court recently noted in *State* v. *Alexander*, 343 Conn. 495, 507 n.10, 275 A.3d 199 (2022), the question of harmlessness is "reserved to 'an appellate court applying the correct standard of review,'" and this court may not speculate as to the degree of influence an objectionable finding had on a final result.

We reiterate, as we did in *State* v. *Alexande*r, supra, 343 Conn. 510, that the trial court's comment regarding the impact of the defendant's hospital confession is not the same as a finding of harmlessness by this court. However, the trial court's observation is strong evidence of the impact the hospital confession had on it, as the fact finder, and we can use that evidence in reaching our conclusion that the state has established beyond a reasonable doubt that any impropriety was harmless. See id. ("[t]he [trial court's] 'insis-

State *v.* Maharg

"In conducting a harmless error analysis, the dispositive issue is 'the impact of the [allegedly improperly admitted] evidence on the trier of fact and the result of the trial.' " *State* v. *Alexander*, 343 Conn. 495, 507, 275 A.3d 199 (2022), quoting *State* v. *Armadore*, 338 Conn. 407, 437, 258 A.3d 601 (2021). We have concluded that, when the case is "tried to a court, not a jury . . . our harmless error analysis is facilitated substantially by the express findings contained in the memorandum of decision by which the [trial court] returned [its] ultimate finding of guilt." *State* v. *Alexander*, supra, 506; see, e.g., *Ghiroli* v. *Ghiroli*, 184 Conn. 406, 408, 439 A.2d 1024 (1981) (recognizing that trial court's explanation that contested evidence " 'was not considered by [the court]' " refuted plaintiff's claim of error); see also, e.g., *State* v. *Velazquez*, 197 Conn. App. 754, 762–63, 231 A.3d 1269 (2020) ("[D]uring the trial, the [trial] court stated that it did not '[find] the testimony that the car smelled of marijuana . . . to be that material [to] the case' . . . [and that] it was not drawing the conclusion that the defendant had been smoking marijuana . . . . [Therefore, the Appellate Court] conclude[d] that any error was harmless.").

Upon reviewing the trial court's findings in the present case in the context of the entire record, we conclude that the defendant's hospital confession did not materially impact the court or the result of the trial. The trial court did not rely on the hospital confession in reaching its conclusions. Indeed, in its memorandum of decision, the court explained that it "did not suppress the spontaneous statements the defendant made within Geddes' earshot because they were neither made in response to police interrogation nor the result of coercive police conduct. Nonetheless, the [court] unanimously con-

tent remarks' that the defendant's 'statements had no effect on [its] decision[s]' reinforce[d] [this court's] confidence in [its] own conclusion that the [improperly admitted evidence] had no impact on the guilty findings at issue").

State *v.* Maharg

cluded that the evidence established the defendant's guilt beyond a reasonable doubt, even in the absence of these statements.''

The trial court found that the defendant's story was not credible, and it based its finding on the forensic evidence presented at trial. On the basis of this evidence, the court determined that the bloodstain evidence showed that ''the assault on [Conley] was not [caused by] a single blow. . . . Notwithstanding [Conley's] unmistakable need for immediate medical intervention, the defendant failed to call for help, despite the evidence that the defendant had the ability to make a call . . . .'' The court also found that none of the defendant's explanations ''to the 911 operator, [to] the paramedic, and to the responding [police] officers . . . [is] supported by the evidence [because] . . . [b]oth . . . Taff and . . . Nunez agree[d] that [Conley's] injuries were not the result of a fall.'' (Footnote omitted.) Lastly, the court considered Taff's ''alternative scenarios,'' but it did not credit his theory that Conley's wounds were self-inflicted due to the ''location, number, and severity of the . . . wounds . . . .''

Accordingly, after conducting our own independent, scrupulous review of the record, we conclude that, even if the trial court improperly admitted the defendant's hospital confession, any alleged error was harmless because the court would have found the defendant guilty beyond a reasonable doubt in the absence of the hospital confession. See, e.g., *United States* v. *Miller*, 800 F.2d 129, 136 (7th Cir. 1986) (''[t]he trial court specifically stated it would disregard the disputed evidence from its evaluation of [the] defendant's guilt, and despite any court's 'many human [frailties],' we must take that statement as true'').

The judgment is affirmed.

In this opinion the other justices concurred.

State *v.* Maharg

McDONALD, J., with whom D'AURIA and ECKER, Js., join, concurring. This is a textbook case that demonstrates, in both dramatic and dangerous fashion, what can go wrong when the police improperly conduct an interview of a suspect. Although I agree with the majority that the judgment of conviction should be affirmed and join its opinion, I write separately to highlight the deeply troubling—perhaps even reckless—manner in which state police officers conducted the interrogation of the defendant, James Maharg, while he was in a seriously compromised medical state as a result of long-term alcohol abuse.[1] The actions of these officers seriously endangered the defendant's physical health, violated both the defendant's constitutional rights and state police policy, and needlessly jeopardized the integrity of the investigation and the ensuing prosecution of this case, all of which undermined the ends of justice.

I begin by emphasizing the shockingly disturbing circumstances under which the state police conducted the defendant's interrogation, for approximately *thirteen hours*, while the defendant was clearly in the dangerous throes of alcohol withdrawal. Trooper Isaiah Gonzalez responded to the defendant's house around 2:20 a.m., following the defendant's 911 call reporting that the defendant found the victim, the defendant's husband, Thomas Conley, lying on the floor "dead" after having hit his head on a kitchen cabinet earlier that evening. As the trial court noted, at that time, "the defendant made several spontaneous statements in [Gonzalez'] presence, including that he and the [victim] ha[d] been drinking a lot since they lost their business and that they had been drinking earlier that evening." At the

---

[1] The defendant was convicted of murder in violation of General Statutes § 53a-54a (a) and tampering with or fabricating physical evidence in violation of General Statutes § 53a-155. On appeal, the defendant does not challenge his conviction of tampering with or fabricating physical evidence.

State *v.* Maharg

scene, police officers observed "alcohol bottles" on the kitchen counter, noting that "[s]ome [of the bottles] were empty, [and] some were not." At approximately 4 a.m., the defendant was transported to State Police Troop A barracks in Southbury. As the trial court found, during the first hour of the interrogation at the police station, Gonzalez and Detective Jared Barbero discussed, among other things, "the fact that the defendant had consumed a significant amount of alcohol the prior evening."

Barbero and another detective, Ed Vayan, proceeded to interrogate the defendant for another approximately twelve hours, despite the defendant's repeated requests to terminate the interview. To compound the disturbing nature of the interrogation, the police officers continued the interrogation even though the defendant was visibly shaking, and they acknowledged that the defendant was exhibiting signs of alcohol withdrawal. The defendant's shaking was so intense that he was unable to sign his name on the *Miranda* notice form to purportedly "certif[y]" that he had been "advised" of his constitutional rights. Instead, at Vayan's direction, the defendant was told to "just make [his] mark" on the form. As witnessed by Barbero and Vayan, this is the "mark" of the defendant:



State *v.* Maharg

It is hard to imagine that, given the defendant's condition, he was able to meaningfully understand the constitutional rights the police purportedly advised him of, much less that he understood how to meaningfully exercise them. For hours during the intensely suggestive interrogation, in addition to violently shaking, the defendant vomited numerous times and repeatedly denied having killed the victim. Ultimately, the defendant acceded to the officers' suggested narrative that he had used a hatchet to murder the victim—which was never supported by any physical evidence—and thus confessed to killing the victim. It was not until approximately thirteen hours into the interrogation, after the defendant had a seizure, that the defendant was transported to a hospital for alcohol withdrawal treatment. Under these extraordinary circumstances, I am hardpressed to understand why the state did not readily acknowledge, at oral argument before this court, that the police interrogation in this case was inexcusable and violated the defendant's constitutional rights, as the three judge trial court determined when it granted the defendant's motion to suppress with respect to the entire thirteen hour interview.

To be clear, the state police seriously endangered the defendant's health by ignoring his obvious signs of physical distress and urgent need for medical treatment. As the trial court found, "[f]rom the outset of the interview, both Barbero and Vayan understood that the defendant had been drinking very heavily at the time of the incident. Barbero and Vayan talked about the defendant's need to sober up and observed the defendant shaking to the point that he could neither hold a cup of coffee steady nor legibly sign his own name [on] the *Miranda* form." A few hours into the interview, the defendant pleaded with Barbero and Vayan that he "need[ed] a drink so bad." In response, Barbero stated, "[y]eah, I can see the withdrawal all over you." The

State *v.* Maharg

defendant made additional pleas of, "[o]h my God, I need a drink so bad," and "I can't stand it, I can't stand this shaking." The trial court found that, instead of seeking immediate medical assistance, "[t]he detectives responded by putting the defendant in a cell." The defendant was then brought back into the interview room, at which point he told the police officers, "I need to go to the hospital to get off this, and I need detox." The defendant subsequently stated, "I need help." Vayan responded, "I know you do," and, notwithstanding that acknowledgment, he and Barbero proceeded to continue questioning the defendant. It was only after the defendant began experiencing a seizure and became "cyanotic"[2] that the ordeal finally came to an end and an ambulance was called. By placing the defendant in serious medical jeopardy, the officers' treatment of the defendant can only be described as recklessly indifferent.[3]

Even putting aside the indifferent nature of law enforcement's treatment of the defendant, the officers' actions needlessly jeopardized the integrity of the investigation and subsequent prosecution of the defendant. Moreover, Barbero testified that state police policy required that state police officers bring a suspect exhibiting signs of alcohol withdrawal to a medical facility.

_____

[2] When paramedics arrived, Barbero told them that the defendant was in "[a]lcohol withdrawal" and that he went "cyanotic," which, as the trial court explained, indicated "that his skin had turned a bluish color." See Merriam-Webster's Collegiate Dictionary (11th Ed. 2014) p. 310 (defining "cyanosis" as "a bluish or purplish discoloration (as of skin) due to deficient oxygenation of the blood").

[3] "[A]cute alcohol withdrawal . . . can cause significant illness and death. Some patients experience seizures, which may increase in severity with subsequent [alcohol withdrawal] episodes. Another potential [alcohol withdrawal] complication is delirium tremens, characterized by hallucinations, mental confusion, and disorientation." L. Trevisan et al., "Complications of Alcohol Withdrawal: Pathophysiological Insights," 22 Alcohol Health & Rsch. World 61, 61 (1998), available at https://pmc.ncbi.nlm.nih.gov/articles/PMC6761825/pdf/arh-22-1-61.pdf (last visited July 7, 2025).

State *v.* Maharg

Barbero and Vayan clearly did not abide by that policy, and, when asked at oral argument whether those officers were ever disciplined for that violation, the state responded, "I do not know." In a case such as this, the state would be well served to come to oral argument before this court equipped with information and persuasive arguments for why this court need not take action to ensure law enforcement's compliance with state law and its own internal policies. Discipline is one such piece of information. Without knowing such information, the state does nothing meaningful to quell concerns when the state police so brazenly ignore their own policies and, more importantly, the law. My own independent review of the record does not reveal that Barbero and Vayan were ever disciplined in any manner for their actions.

These observations about the police officers' actions in this case are far from irrelevant. Courts must often consider whether there are policies or other incentives or disincentives in place to ensure that state officials conform their conduct to law. As we have recently noted, courts regularly struggle to acquire reliable information about whether existing constitutional or prophylactic rules are working (or new ones are desirable) to deter misconduct that violates not only the rights of those who become suspects, targets or criminal defendants, but the rights of all of us who are members of a free society. Indeed, this is not the only case in this court year in which we have had to grapple with this challenge. For example, in *State* v. *Haynes*, 352 Conn. 236, A.3d (2025), we were asked to devise a new prophylactic rule under the state constitution for instances in which the state wants to use an illegally obtained statement to impeach the trial testimony of a defendant in a criminal case. See id., 250–51 and n.10. Although we declined, over a spirited dissent; see id., 264 (*Ecker*, *J.*, concurring and dissenting); to overrule

State *v.* Maharg

a prior case from this court addressing this question; see *State* v. *Reid*, 193 Conn. 646, 480 A.2d 463 (1984); we observed that "[t]he legitimacy of prophylactic constitutional rules derives from their necessity. . . . There is general agreement that courts should use their authority to devise prophylactic rules cautiously and to tailor them to be as narrow as possible to accomplish their purpose. . . . Courts create prophylactic rules when they determine that the risk of a constitutional violation is sufficiently great [such] that simple case-by-case enforcement of the core right is insufficient to secure that right. . . . This court has demonstrated that it will devise and implement additional prophylactic rules, beyond those that federal law compels, when we are persuaded that they are necessary to protect the constitutional rights within our state." (Citations omitted; internal quotation marks omitted.) *State* v. *Haynes*, supra, 250–51 n.10.

Our consideration of whether to adopt a new or modified prophylactic rule under state law is not the only instance in which we will often look to whether there are other incentives or disincentives in place to ensure that state officials will conform their conduct to law. To cite one example, when we are faced with the question of whether to extend absolute immunity to state actors for actions taken in the course of their duties, one relevant consideration is whether there are sufficient checks in place that discourage state officials from violating the law. See, e.g., *Mitchell* v. *Forsyth*, 472 U.S. 511, 522–23, 105 S. Ct. 2806, 86 L. Ed. 2d 411 (1985) ("[M]ost of the officials who are entitled to absolute immunity from liability for damages are subject to other checks that help to prevent abuses of authority from going unredressed. Legislators are accountable to their constituents . . . and the judicial process is largely self-correcting: procedural rules, appeals, and the possibility of collateral challenges obviate the need for dam-

State *v.* Maharg

ages actions to prevent unjust results.'' (Citation omitted.)); *Khan* v. *Yale University*, 347 Conn. 1, 28–29, 295 A.3d 855 (2023) (''[b]ecause absolute immunity removes the threat of private defamation actions in order to incentivize witnesses to participate candidly and willingly in the proceeding, it is crucial that there be some strong deterrent, such as the threat of a perjury prosecution, against abuse of the privilege by the giving of untruthful testimony'').

In sum, there are various circumstances in which courts look for policies or other rules that may ensure a public official's compliance with state law, short of this court stepping in to ensure such compliance. It is incumbent on the state to assure this court that there are mechanisms in place to ensure compliance with state law and to protect an individual's constitutional rights. In this case, we have no assurances that existing measures are sufficient to deter the type of reckless indifference exhibited by the police officers. Such assurances could have included, for example, the fact that the officers were disciplined as a result of their violation of state police policy or that their reckless indifference may have jeopardized their qualified immunity. The state cannot simply rely on the absence of *any* relevant evidence or an agreed on measure of determining the prevalence of similar violations to avoid the development of a new rule.

Here, there is no question that the police officers were aware that the defendant had been drinking heavily at the time of the incident and was in the throes of alcohol withdrawal during the interrogation. Indeed, the trial court found as much. For example, and in addition to the evidence already discussed, when asked at the probable cause hearing whether the defendant appeared to have been drinking, Gonzalez stated that ''[the defendant] did have . . . [a] smell or . . . odor emanating from him that smelled like it could [be an]

State *v.* Maharg

. . . alcohol-like substance, yes.'' At trial, Gonzalez acknowledged that he remembered testifying at the probable cause hearing that the defendant had smelled like alcohol. Vayan testified at the probable cause hearing that, during the police interrogation, the defendant told him that "there was a lot of alcohol consumption involved'' on the night of the murder. Vayan also testified that the defendant was intoxicated "earlier'' in the interrogation and that he could smell alcohol on the defendant during the interrogation. Barbero testified at trial that the defendant had "tremors'' and "[s]hakes'' during the interview but that the police did not "test his breath or . . . blood'' to determine if he was intoxicated.[4]

It is eminently reasonable for the public to expect law enforcement to treat suspects within its custody in a professional and humane manner, without needlessly endangering their health and well-being. At a bare minimum, law enforcement must follow its own policies when it comes to caring for suspects within its custody. In the present case, the police officers did neither, and we have no assurances that their blatant breach of protocols was an isolated incident. I am deeply concerned that the officers acted with reckless indifference to the defendant's health and that the state did not find these actions troubling enough to even inquire of the state police regarding any disciplinary action taken or additional training that these officers may have received as a result of their actions. As a consequence, we have not been offered any of the necessary assurances this court needs to determine whether the acts of these officers were isolated in nature, rather than a part of a more widespread, systemic problem that might require this court to take action.

_____

[4] Although the defendant's blood alcohol concentration was not tested, the victim's postmortem blood alcohol concentration was 0.393 according to a toxicology report.